**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HUSSEIN NAJI, as Personal Representative
of the Estate of ALI NAJI,

      Plaintiff,

v.

CPL. TIMOTHY CLIVE, and CITY OF
DEARBORN

      Defendants.

_____/

Case No. 23-10521
Hon. F. Kay Behm
Magistrate Jonathan J.C. Grey

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR FOR JUDGMENT ON THE PLEADINGS</u>

Pursuant to Rules 56(a) and 12(c), Federal Rules of Civil Procedure, and for the reasons set forth in the following Brief in Support, Defendants respectfully request that Plaintiff's First Amended Complaint (ECF No. 11) be dismissed in its entirety.

Pursuant to Local Rule 7.1(a), there was a conference between the parties on April 4, 2023 and on June 22, 2023, during which counsel for Defendants explained the nature of this motion and its legal bases and requested that Plaintiff concur in the relief sought.  Plaintiff, however, did not concur.

1

Respectfully submitted,

AUGUST LAW, PLLC


By:     */s/   Gary K. August*
        Gary K. August (P48730)
        Michael C. Lewis (P59139)
        Attorneys for Defendants
        29201 Telegraph Road, Suite 510
        Southfield, MI 48034
        (248) 833-6225
        gaugust@august-law.com
        mlewis@august-law.com

Dated: June 26, 2023

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HUSSEIN NAJI, as Personal Representative
of the Estate of ALI NAJI,

      Plaintiff,

v.

CPL. TIMOTHY CLIVE, and CITY OF
DEARBORN

      Defendants.

_____/

Case No. 23-10521
Hon. F. Kay Behm
Magistrate Jonathan J.C. Grey

## **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

ISSUES PRESENTED...........................................................................iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY  FOR RELIEF SOUGHT.. v

INDEX OF AUTHORITIES ................................................................ vi

INDEX OF EXHIBITS........................................................................ ix

STATEMENT OF MATERIAL FACTS ................................................ 1

ARGUMENT – PLAINTIFF'S FIRST AMENDED COMPLAINT SHOULD BE
DISMISSED IN ITS ENTIRETY .......................................................... 6

    A.    Legal Standards ...................................................................... 6

        1.    Rule 56(a) ....................................................................... 6

        2.    Rule 12(c) ....................................................................... 7

    B.    Plaintiff's First Amended Complaint Violates Rule 11........................ 8

    C.    Each Cause of Action in the First Amended Complaint Fails............. 9

        1.    Count I – Fourth Amendment............................................. 9

            a.  Clive's Conduct Was Objectively Reasonable; He
                Did Not Violate Naji's Fourth Amendment Rights............ 10

            b.  The Fourth Amendment Right Plaintiff Alleges Was
                Not Clearly Established at the Time of the Shooting....... 12

            c.  Plaintiff's Anticipated Arguments Do Not Alter the
                Analysis of Either Element of the Qualified
                Immunity Test................................................................... 13

                i.  Naji's Alleged Mental Illness ............................... 13

                ii.  Lack of De-escalation ........................................... 14

                iii. The Protective Glass............................................ 15

                iv. Other Situations Involving Clive and Armed
                   Suspects ................................................................ 15

                v.  The Number of Shots Fired.................................. 16

            d.  Summation of Qualified Immunity Argument ................. 19

        2.    Count II – *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)
            *("Monell")* ....................................................................... 20

3.  Count III – Assault and Battery Under Michigan Law ........... 20

4.  Count IV – Gross Negligence Under Michigan Law ................ 21

5.  Count V – Persons With Disabilities Civil Rights Act, MCL § 37.1101, *et seq.* ................................................................. 22

6.  Count VI – Michigan Freedom of Information Act, MCL § 15.231, *et seq.* ......................................................................... 23

CONCLUSION ................................................................................................. 25

CERTIFICATE OF SERVICE ......................................................................... 26

## ISSUES PRESENTED

1.      Should Count I, the federal law claim alleging violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983, be dismissed on the basis of qualified immunity because: (a) Corporal Clive did not violate the decedent's Fourth Amendment rights; and/or (b) the Fourth Amendment right Plaintiff alleges was not clearly established at the time of the shooting?

Defendants answer: Yes.

2.      Should Count II, the federal law claim brought pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), be dismissed because no underlying Fourth Amendment violation exists?

Defendants answer: Yes.

3.      Should Count III, the state law claim alleging assault and battery, be dismissed because Corporal Clive believed in good faith that his use of deadly force was necessary such that he is immune from liability under Michigan law?

Defendants answer: Yes.

4.      Should Count IV, the state law claim alleging gross negligence, be dismissed because Michigan law does not permit civil litigants to transmute plainly intentional acts, such as Corporal's Clive use of deadly force in this case, into claims for gross negligence?

Defendants answer: Yes.

5.      Should Count V, the state law claim alleging violation of the Persons With Disabilities Civil Rights Act, MCL § 37.1101, *et seq*., be dismissed because the statute does not apply on these facts and, even if it did, Plaintiff cannot demonstrate a violation of the statute?

Defendants answer: Yes.

6.      Should Count VI, the state law claim alleging violation of the Michigan Freedom of Information Act, MCL § 15.231, *et seq*., be dismissed because it is moot or because it is no longer fit for adjudication in this Court pursuant to 28 U.S.C. § 1367(c)(3)?

Defendants answer: Yes.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY<br>FOR RELIEF SOUGHT</u>

*Cunningham v. Shelby Cty.*, 994 F.3d 761 (6th Cir. 2021)

*Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004)

*Graham v. Connor*, 490 U.S. 386 (1989)

*Odom v. Wayne Cty.*, 482 Mich. 459 (2008)

*Pearson v. Callahan*, 555 U.S. 223 (2009)

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)

*Roell v Hamilton Cty.*, 870 F.3d 471 (6th Cir. 2017)

*Scott v. Harris*, 550 U.S. 372 (2007)

*Tennessee v. Garner*, 471 U.S. 1 (1985)

*White v. Pauly*, 580 U.S. 73 (2017)

## INDEX OF AUTHORITIES

**Cases**

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ............................................................................................. 12

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ............................................................................................. 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 7

*Bates v. Green Farms Condo. Ass'n,*
   958 F.3d 470 (6th Cir. 2020) ......................................................................... 7, 23

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 7

*Blackmore v. Kalamazoo Cty.*,
   390 F.3d 890 (6th Cir. 2004) .............................................................................. 21

*Boyd v. Baeppler*,
   215 F.3d 594 (6th Cir. 2000) ....................................................................... 18, 19

*Burgess v. Fischer*,
   735 F.3d 462 (6th Cir. 2013) .............................................................................. 10

*Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*,
   508 F.3d 327 (6th Cir. 2007) ................................................................................ 7

*Cunningham v. Shelby Cty.*,
   994 F.3d 761 (6th Cir. 2021) ................................................................ 6, 18, 19

*Gaddis v. Redford Twp.*,
   364 F.3d 763 (6th Cir. 2004) ............................................... 14, 15, 17, 19

*Graham v. Connor*,
   490 U.S. 386 (1989) ..................................................................................... 11, 19

*Gregory v. Shelby Cty.*,
   220 F.3d 433 (6th Cir. 2000) ................................................................................ 7

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ............................................................................................... 9

*Hunter v. Bryant*,
   502 U.S. 224 (1991) ............................................................................................. 10

*Johns v. Chesterfield Cty.*,
   216 F.3d 367 (4th Cir. 2000) .............................................................................. 23

*Lattis v. Phillips,*
    298 Mich. App. 109 (2012) ........................................................................... 21, 22
*Malley v. Briggs,*
    475 U.S. 335 (1986) ............................................................................................ 10
*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) ..................................................................................... iii, 20
*Mullenix v. Luna,*
    577 U.S. 7 (2015) ................................................................................................ 12
*Mullins v. Cyranek,*
    805 F.3d 760 (6th Cir. 2015) .......................................................................... 10
*Odom v. Wayne Cty.,*
    482 Mich. 459 (2008) ................................................................................... 21, 22
*Pearson v. Callahan,*
    555 U.S. 223 (2009) ......................................................................................... 9, 10
*Plumhoff v. Rickard,*
    572 U.S. 765 (2014) ........................................................................................... 19
*Puskas v. Delaware Cty.,*
    56 F.4th 1088 (6th Cir. 2019 ) .................................................................... 14, 15
*Roell v. Hamilton Cty.,*
    870 F.3d 471 (6th Cir. 2017) ........................................................... 6, 10, 14, 15
*Sanders v. City of Minneapolis,*
    474 F.3d 523 (8th Cir. 2007) .......................................................................... 23
*Scott v. Harris,*
    550 U.S. 372 (2007) ............................................................................................ 6
*Stevens-Rucker v. City of Columbus,*
    739 F. App'x. 834 (2018) ............................................................................. 18, 19
*T.S. v. Doe,*
    742 F.3d 632 (6th Cir. 2014) .......................................................................... 10
*Tennessee v. Garner,*
    471 U.S. 1 (1985) ........................................................................................... 11, 13
*Van Vorous v. Burmeister,*
    262 Mich. App. 467 (2004) .............................................................................. 22
*Watkins v. City of Battle Creek,*
    273 F.3d 682 (6th Cir. 2002) .......................................................................... 21
*White v. Pauly,*
    580 U.S. 73 (2017) .............................................................................................. 12

*Williams v. City of Chattanooga,*
  772 F. App'x. 277 (6th Cir. 2019) ................................................................. 18, 19

## Statutes

28 U.S.C. § 1367(c)(3) ........................................................................................ 25
MCL § 15.231 ........................................................................................................ 23
MCL § 37.1102(1) ................................................................................................ 22

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 7
Fed. R. Civ. P. 12(c) ........................................................................................ 7, 22
Fed. R. Civ. P. 56(a) ........................................................................................ 6, 9
Fed. R. Civ. P. 11(b)(1) ........................................................................................ 9
Fed. R. Civ. P. 11(b)(2) ........................................................................................ 9
Fed. R. Civ. P. 11(b)(3) ........................................................................................ 9
Fed. R. Civ. P. 15(a)(1)(A) .................................................................................... 8
Fed. R. Civ. P. 15(a)(1)(B) .................................................................................... 8

## <u>INDEX OF EXHIBITS</u>

Exhibit A      Deposition Transcript of Corporal Timothy Clive

Exhibit B1     Dearborn Police Headquarters Lobby Surveillance Video Footage
               – Lobby Desk

Exhibit B2     Dearborn Police Headquarters Lobby Surveillance Video Footage
               – Lobby Doors

Exhibit B3     Dearborn Police Headquarters Lobby Surveillance Video Footage
               – Lobby Elevator

Exhibit B4     Dearborn Police Headquarters Lobby Surveillance Video Footage
               – Lobby Waiting

Exhibit B5     Dearborn Police Headquarters Lobby Surveillance Video Footage -
               Front Circle

Exhibit C      *Williams v. City of Chattanooga,* 772 Fed. Appx. 277 (6th Cir. 2019)

Exhibit D      *Stevens-Rucker v. City of Columbus*, 739 Fed. Appx 834 (6th Cir.
               2018)


Exhibits B1-B5 will be filed in accordance with Rule 19(c), Electronic Filing
Policies and Procedures.

## STATEMENT OF MATERIAL FACTS

1. This case arises out of an incident that occurred in the lobby of the City of Dearborn Police Headquarters on December 18, 2022, at 3:32 p.m. when Corporal Timothy Clive ("Clive"), a 14-year veteran of the Dearborn Police Department, shot and killed Plaintiff's decedent, 33-year-old Ali Naji ("Naji"). (ECF Nos. 11, 12; Exhibit A, transcript of deposition of Corporal Timothy Clive, pgs. 18-19).

2. The incident was captured on five surveillance cameras: (a) the "Lobby Desk" camera, positioned above the front desk; (b) the "Lobby Doors" camera, which monitors the main entrance directly across from the front desk; (c) the "Lobby Elevator" camera, positioned near to and above the lobby's elevator to the right of the front desk; (d) the "Lobby Waiting" camera, positioned above the lobby's waiting room to the left of the front desk; and (e) the "Front Circle" camera, positioned outside the police station's circle drive facing northwest. The camera footage, collectively filed as Exhibit B, is identified individually as follows:

> Exhibit B1 – Lobby Desk;
> Exhibit B2 – Lobby Doors;
> Exhibit B3 – Lobby Elevator;
> Exhibit B4 – Lobby Waiting; and

Exhibit B5 – Front Circle[1]

3.      Collectively, the five cameras yielded 58 minutes of footage (Lobby Desk – 9:36; Lobby Doors – 12:47; Lobby Elevator – 11:28; Lobby Waiting – 9:46; and Front Circle – 14:23), though the substantial majority of the footage is irrelevant because it depicts the shooting's aftermath.  This motion is based primarily upon the Lobby Elevator footage - 3:32:38-3:33:02 (a period of 24 seconds) - because this section of footage clearly depicts the movements of both men.  The Court should note that the Lobby Elevator footage does not contain audio (nor do the Lobby Waiting or the Front Circle footage), whereas the Lobby Desk and Lobby Doors footage do contain audio.

4.      Clive was working the "position-1 desk" in the rear of the police station.  (Exhibit A, pg. 73).  Between the other police officers and civilian staff on duty/working that afternoon, there were eleven or so people in the police station at the time of the shooting.  (Exhibit A, pg. 92).

5.      Though December 18, 2022 was a Sunday, the police station was busy because members of the public were dropping off/picking up Christmas gifts in support of the police department's "No Child Without a Christmas Toy

---

[1] The Front Circle footage is filed for purposes of continuity only.  No portion of Front Circle footage is cited herein.

Drive." (Exhibit A, pgs. 89-91).  Clive described December 18, 2022 as "one of the more busy Sundays I ever worked." (Exhibit A, pg. 91).

6.     At 3:32:38 p.m., Naji entered the lobby through the front door.  He was darkly dressed, wearing black pants, a black jacket, a black winter hat, and a Covid-style face mask.  (Exhibit B3, Lobby Elevator, 3:32:38).

7.     Clive saw Naji enter the lobby via a closed-circuit television mounted near the position-1 desk.  (Exhibit A, pgs. 73-74).  He then walked to the front desk and greeted Naji, asking him "How you doin?"  (Exhibit A, pgs. 74-75, 93; Exhibit B1, Lobby Desk, 3:32:48).

8.     Without any warning, justification, or provocation whatsoever, Naji, using his right hand, removed a handgun from his rear waistband, pointed it at Clive, and pulled the trigger.  (Exhibit A, pgs. 93-94; Exhibit B3, Lobby Elevator, 3:32:48 – 3:32:50).  Thankfully, the gun malfunctioned such that no bullet was fired.  The Lobby Elevator footage shows a portion of Clive's body jumping back when Naji produced the gun (Exhibit B3, Lobby Elevator, 3:32:50).

9.     Naji then attempted to correct the gun's malfunction by reloading the magazine and pulling back on the weapon's slide so as to rack a bullet into the chamber.  (Exhibit A, pg. 94; Exhibit B3, Lobby Elevator, 3:32:51-3:32:55).

10.     When Naji produced the gun, Clive shouted "gun, gun, gun, . . ." to alert his colleagues of the emergency.  (Exhibit A, pg. 82; Exhibit B1, Lobby Desk, Exhibit B2, Lobby Doors, 3:32:51-3:32:55).  When Naji pulled the trigger, Clive heard it "click."  (Exhibit A, pg. 94).  Clive then watched Naji reload the magazine and pull back on the weapon's slide.  (Exhibit A, pg. 94).  He believed Naji "was in the process of fixing a malfunction to kill myself or to kill anybody else that entered that lobby."  (Exhibit A, pg. 95).

11.     Clive slid open the front desk window and fired seventeen shots in a continuous, 4-5 second volley (Exhibit A, pg. 69, 81, 85-86; Exhibit B3, Lobby Elevator, 3:32:56 – 3:33: 01).  It is unclear how many shots struck Naji but it appears that Clive's first shot - perhaps his first two shots – missed Naji and instead struck and shattered a window of the front vestibule.  (Exhibit B2, Lobby Doors, 3:32:57).

12.     Naji fell to the ground or dove to the ground early in the shot sequence.  Clive, however, "never saw [Naji] drop the gun" though he did see Naji "rearing up onto his right side" as if "he was still going to try to shoot and kill me."  (Exhibit A, pgs. 95-96; Exhibit B3, Lobby Elevator, 3:32:57 – 3:33:00).  Clive continued to fire until he "thought the threat was neutralized."  (Exhibit A, pg. 96).

13.     On the Lobby Waiting camera, Naji can be seen losing control of the gun around the same time the window shatters.  (Exhibit B4, Lobby Waiting, 3:32:57).   His gun came to rest at the base of the front door (behind the signpost).  (Exhibit B2, Lobby Doors, 3:32:57 forward).

14.     From the time Naji entered the lobby to the time Clive opened fire, 18 seconds passed.  (Exhibit B3, Lobby Elevator, 3:32:38 – 3:32:56).

15.     There are six separate entrances into the lobby: (a) through the door Naji used, i.e., the public entrance; (b) through the door on the right side of the front desk which leads down into the lobby; (c) through a more secure door to the right of and behind the front desk; (d) off an elevator, also to the right of the front desk; (e) through a door to the left of the front desk which leads from the records department; and (f) via the lobby stairwell.  (Exhibit A, pgs. 92-93).

## ARGUMENT – PLAINTIFF'S FIRST AMENDED COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY

### A.   Legal Standards

### 1.   Rule 56(a)

"A party may move for summary judgment, identifying each claim . . . – or the part of each claim . . . – on which summary judgment is sought." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when no genuine dispute of material facts exists and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  The moving party bears the burden to 'demonstrate the absence of a genuine [dispute] of material fact.'" *Roell v. Hamilton County*, 870 F.3d 471, 479-80 (6th Cir. 2017) (internal citations omitted).

Notably, in an excessive force case, "[w]hen videotape footage exists, the reviewing court need not credit the version of a party who asserts facts 'blatantly contradicted' by the videotape; rather [the court] should view the facts in the light depicted by the videotape." *Cunningham v. Shelby County, Tennessee*, 994 F.3d 761, 763 (6th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

## 2. <u>Rule 12(c)</u>

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings generally follows the same rules as a motion to dismiss under Rule 12(b)(6). *Bates v. Green Farms Condo. Assoc.,* 958 F.3d 470, 480 (6th Cir. 2020). A court evaluating [a motion under Rule 12(c)] must heed the Supreme Court's rulings in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). *Id.*

Specifically, "[c]ourts must accept as true all well pleaded allegations, but they need not accept legal conclusions." *Id.* "And the well pleaded factual allegations must 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Pleaded facts will do so if they 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* "Pleaded facts will not do so if they 'are merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557).

A court need not accept unwarranted factual inferences as true. *Gregory v. Shelby Cty.*, 220 F.3d 433, 446 (6th Cir. 2000). To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements of a viable legal theory. *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 336 (6th Cir. 2007).

**B.**   <u>**Plaintiff's First Amended Complaint Violates Rule 11**</u>

At the outset, it must be noted that *Plaintiff's First Amended Complaint does not admit that Naji was armed or that he tried to shoot Clive*. The pleading, in fact, alleges "Upon information and belief, [Clive] posed a deadly threat to [Naji's] physical safety *without a cause known to Plaintiff* as to why [Clive] deemed it appropriate to riddle the body of [Naji] with bullets . . ." ECF No. 11, ¶21 (italics added).

Plaintiff filed the Complaint on March 3, 2023. ECF No. 1. Other than identifying Clive as "Defendant Doe," paragraph 21 of the Complaint is identical to paragraph 21 of the First Amended Complaint. ECF No. 11. On March 16, 2023, thirteen days after Plaintiff filed the Complaint and before the video was made available to the public via YouTube, the City of Dearborn showed the footage to Plaintiff and his counsel. The footage they saw was a thirty-three second split-screen of the Lobby Desk and Lobby Elevator cameras. Despite seeing this footage, Plaintiff made no attempt to amend the Complaint in the thirteen days before Defendants filed their Answer on March 29, 2023 (Rule 15(a)(1)(A)), or in the ensuing 21-day amendment period (Rule 15(a)(1)(B)). Then, on May 8, 2023, when Plaintiff amended the Complaint pursuant to ECF No. 10, he failed to plead that Naji was armed or that he had tried to shoot Clive.

Other than swapping out the identifier "Defendant Doe" for the identifier "Clive," the First Amended Complaint simply "cuts and pastes" the Complaint.

How Plaintiff could watch the video and then forego three separate opportunities to either voluntarily dismiss this case or plead plainly crucial facts in the new pleading is difficult to fathom.  His omission violates Rules 11(b)(1), (2), and (3) and it indelibly underscores the importance of video evidence when one party asserts facts "blatantly contradicted" by the video footage.

### C.    Each Cause of Action in the First Amended Complaint Fails

#### 1.    Count I – Fourth Amendment

Count I fails on the basis of qualified immunity and should be dismissed pursuant to Rule 56(a).  Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction and liability when they perform their duties reasonably."  *Id.* at 231.  "When properly applied, [qualified immunity] protects

'all but the plainly incompetent or those who knowingly violate the law.'"
*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S.
335, 341 (1986).  The doctrine is broad enough to provide ample room for
mistaken judgments. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "In a civil suit
arising from the use of deadly force, immunity should be recognized if officers
of reasonable competence could disagree on the issue." *Mullins v. Cyranek*, 805
F.3d 760, 765 (6th Cir. 2015).  Importantly, Plaintiff bears the burden of proving
that Clive is not entitled to qualified immunity on these facts.  *Roell*, 870 F.3d at
480; *accord Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

A court asks two questions to evaluate whether a police officer is entitled
to qualified immunity: (1) whether the officer violated the Fourth Amendment;
and (2) whether the Fourth Amendment right alleged was clearly established
at the time of the incident.  *Roell*, 870 F.3d at 480 (internal citations omitted).
These questions may be answered in either order.  *Pearson*, *supra*, at 236. "If
the plaintiff fails to establish either element, the defendant is immune from
suit." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).

    a. <u>**Clive's Conduct Was Objectively Reasonable; He Did Not
Violate Naji's Fourth Amendment Rights**</u>

Whether an officer has used excessive force "requires careful attention to
the facts and circumstances of each particular case, including the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest by flight or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Crucially, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[W]here an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Here, the *Graham* factors overwhelmingly favor Clive. The crime Naji committed was the attempted murder of a police officer, and clearly Naji posed an immediate, ongoing threat not only to Clive, but to anyone who may have walked into the lobby, including other police officers, civilian staff, and the general public - such as the families who had been stopping by the police station throughout the day in support of the Department's toy drive. It is only by the grace of God that the lobby was empty when Naji arrived and that it remained

empty throughout this absolutely stunning encounter.  The third *Graham* factor, resisting or evading by flight, is inapposite given how quickly the events unfolded.  Naji wasn't trying to escape, he was trying to kill.  That Clive's conduct was objectively reasonable is manifest.  As a result, he is immune from suit.

### b. <u>The Fourth Amendment Right Plaintiff Alleges Was Not Clearly Established at the Time of the Shooting</u>

The contours of a Fourth Amendment right must be "sufficiently clear" so that "a reasonable official would know that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  There need not be a case directly on point for a right to be "clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017).  Police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.  *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (internal citation and emphasis omitted).

Plaintiff must cite precedent holding that a citizen in circumstances like those created by Naji has a right *not to be shot.*  In the great grey ocean of excessive force jurisprudence, however, no case holds that a plaintiff may ambush a police officer, attempt murder, and expect not to be shot.  On the contrary, the law provides that when "an officer has probable cause to believe

that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v Garner*, 471 U.S. at 11.  Clearly established law thus supports Clive's decision to use deadly force which makes it impossible for Plaintiff to establish the opposite - that the Fourth Amendment right Clive allegedly violated was clearly established at the time of the shooting.

### c.  Plaintiff's Anticipated Arguments Do Not Alter the Analysis of Either Element of the Qualified Immunity Test

In an effort to overcome qualified immunity, Plaintiff will likely make five arguments: (1) that Naji was mentally ill; (2) that Clive made no effort to de-escalate the encounter; (3) that Clive was behind protective glass when Naji tried to kill him; (4) that Clive has been in other dangerous situations where he did not use deadly force; and (5) that Clive fired too many shots.  None of these arguments have merit.

### i.  Naji's Alleged Mental Illness

Plaintiff alleges that Naji was mentally ill, though his pleading fails to identify a specific mental illness.  ECF No. 11 ¶¶ 16, 18, Count V, pgs. 16-19. That Plaintiff alludes to mental illness at all, however, shows the degree to which he is grasping at straws because for the argument to have merit, Clive had to know that Naji was mentally ill.  But not surprisingly, when Naji entered the

13

police station (masked no less), Clive had no idea who he was.  (Exhibit A, pg. 95).  Clive saw Naji for only a few seconds before Naji tried to kill him so, other than Naji being armed and dangerous, Clive had no time to discern anything else about him.

And even if Clive had known that Naji was mentally ill, it would not have changed anything because police officers facing emergencies are not required to accommodate disabilities.  *See*, *e.g.*, *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004) (affirming dismissal on summary judgment where officers shot a knife wielding, mentally disturbed assailant in a single volley of sixteen shots); *Roell*, 870 F.3d at 489 (affirming dismissal on qualified immunity grounds in a 1983/ADA case where a mentally ill plaintiff's requested accommodations were deemed unreasonable in light of overriding public safety concerns); *Puskas v. Delaware Cty.*, 56 F.4th 1088, 1098 (6th Cir. 2019 ) (use of deadly force against an individual alleged to have been mentally ill upheld because officers were responding to a "*live* crime scene, with a non-compliant, erratic, and most important, *armed* suspect.") (italics in original).

### ii.    <u>Lack of De-escalation</u>

Clive testified that he did not attempt to de-escalate the encounter because "[t]here was not time, and [Naji] was in the process of fixing a malfunction to kill myself or anybody else that entered that lobby."  (Exhibit A,

pg. 95).  There is no genuine issue of material fact on this question.  *Gaddis*, *Roell*, and *Puskas* all support Clive's testimony that he faced an emergency that simply did not afford any time for de-escalation.

### iii.    The Protective Glass

Still, Plaintiff believes that because Clive was behind glass, he had time to attempt to de-escalate and/or refrain from using deadly force.  This is false.  As a police officer, no matter where Clive was positioned inside the building, he obviously could not allow Naji to start shooting up the lobby.  Doing so would have been a complete abdication of his sworn duty.  Clive was concerned about people entering the lobby from the various access points (six of them) inside the building.  (Exhibit A. pg. 92-93; 95).  This is why he *slid open* the glass window - to engage Naji.  (Exhibit A, pg. 67-68; Exhibit B1, Lobby Desk, 3:32:57).  The intimation that Clive could have simply hunkered down behind the glass while Naji blasted away is nothing short of ludicrous.[2]

### iv.    Other Situations Involving Clive and Armed Suspects

In his deposition, Clive discussed two prior incidents involving armed suspects.  The first was a foot chase in 2015 where the assailant threw away a

---

[2] Equally ludicrous is Plaintiff's suggestion that Naji's gun might not have been real.  (Exhibit A, pg. 76, 89).  To this Clive responded "[i]t looked real to me." (Exhibit A, pg. 89), which, of course, it was (a Ruger 9mm).

handgun (concealed in his waistband and never brandished) before Clive apprehended him.  (Exhibit A, pgs. 28-29, 31-33, 62).  The second was an unusual incident on February 5, 2017, where two men with long guns walked into the police station to make a political point about "open carry" under the Second Amendment.  (Exhibit A, pgs. 36-45, 46, 49-55).  One of the men livestreamed the event and the footage is available on YouTube, though defense counsel does not know the page address.[3]  After a brief stand-off, (approximately two minutes), the men surrendered and were arrested.

It is not clear why Plaintiff is interested in these events.  Obviously, they have no bearing on whether Clive's conduct was objectively reasonable on December 18, 2022, and in neither incident did the assailants even raise a gun at Clive much less try to kill him like Naji did.  (Exhibit A, pg. 62, 93).

### v.   **The Number of Shots Fired**

Clive fired seventeen shots in a continuous, 4-5 second volley, though again, it is unclear how many bullets struck Naji.  Three facts are paramount: one, Clive was ambushed, two, Clive never saw Naji drop the gun, and three, the video shows Naji attempting to roll onto his right side - the same arm he had

---

[3] Plaintiff's counsel used this video (which he marked "Exhibit 2") during Clive's deposition, but a copy of the footage was not produced with the deposition transcript, nor has it otherwise been made available to defense counsel.

attempted to fire with.[4]  (Exhibit B3, Lobby Elevator, 3:32:57-3:33:00).  This is why Clive continued to fire - because he believed Naji was "still a threat . . . rearing up onto his right side, almost like he was getting – he was attempting to lay on his right side" like "he was still going to try to shoot and kill me."  (Exhibit A, pg. 96).

Numerous cases support Clive's decision to fire seventeen shots in a continuous, 4-5 second volley.  *See*, e.g., *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004) (affirming summary judgment where two officers shot a knife wielding, mentally disturbed assailant in a single volley of sixteen shots); *Williams v. City of Chattanooga,* 772 F. App'x. 277 (6th Cir. 2019) (affirming qualified immunity where six officers fired a total of eight shots [separate volleys of two and six] at an assailant who had charged out of a home carrying a gun and a sword and who continued to shift his position on the ground after he was brought down by the first volley of shots) (Exhibit C); *Cunningham v. Shelby Cty.*, 994 F.3d 761 (6th Cir. 2021) (reversing denial of qualified immunity for two officers who fired a total of ten shots at an assailant who, in an eleven

---

[4] It would have been virtually impossible to see Naji drop the gun in the heat of the moment, especially considering how he fell – away from Clive in a foreshortened position where his body likely blocked view of the gun, which now lay at the base of the front door, even further away from Clive (Exhibit A, pgs. 95-96; Exhibit B3, Lobby Elevator, 3:32:57-3:33:00, Exhibit B4, Lobby Waiting, 3:32:57).

second encounter, refused to drop what appeared to be a .45 caliber pistol that turned out to be a BB gun); *Boyd v. Baeppler*, 215 F.3d 594, 603 (6th Cir. 2000) (reversing denial of qualified immunity where two officers, while pursuing a suspect on foot, fired a total of eleven shots, including seven shots after the assailant "lifted his torso [off the ground] and turned to point his weapon."); *Stevens-Rucker v. City of Columbus*, 739 F. App'x. 834, 844 (2018) (officer was immune where he continued to fire as a knife-wielding suspect fell to the ground because a single volley of shots "within a second of one another . . . was not enough time for [the officer] to stop and reassess the threat level . . . He continued to use his firearm to stop what he justifiably perceived as an immediate threat to his safety.") (Exhibit D).

Finally, in a case involving fifteen shots fired in two volleys, the Supreme Court reversed the denial of qualified immunity in a high-speed chase case, recognizing that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

Every excessive force case is different, though what they share in common is a close examination of the facts, which is why opinions in excessive force cases tend to be long – courts lay out the facts very carefully. Despite the emergencies in *Gaddis, Williams, Cunningham, Boyd*, and *Stevens-Rucker*, here the emergency

18

was more dire because Naji had ambushed Clive.  Clive was not responding to a 911 call or making a traffic stop like the officers in those other cases.  He had no idea his life was in danger when he performed the simple act of walking to the front desk to greet Naji.  Naji tried to kill him, plain and simple, and he was attempting to fix the gun's malfunction so that he could try again.  This case epitomizes the reality that police officers are often forced to make "split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  Clive did what any reasonable officer in his shoes would have done – he "stopped the threat" – and under the totality of circumstances, the number of shots fired should give no fair observer pause.  (Exhibit A, pg. 96).

### d.  <u>Summation of Qualified Immunity Argument</u>

In sum, this is a clear case of qualified immunity.  Frankly, if the qualified immunity doctrine didn't exist, Clive would be entitled to summary judgment on self-defense grounds - on the merits of the case, in other words.  But qualified immunity exists to protect police officers from the burdens of litigation and that is why Defendants are bringing this motion early in the process.  Clive's conduct was objectively reasonable, and the Fourth Amendment right Plaintiff alleges simply does not exist.  If Clive is not immune on these facts, no police officer

ever is, and the doctrine of qualified immunity might as well be excised from the law.

### 2.   Count II – *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)

Count II is brought against the City of Dearborn ("Dearborn").  Claims brought under *Monell v Dept' of Soc. Servs.*, 436 U.S. 658 (1978) allege constitutional violations against governmental entities that allegedly foster unconstitutional policies and practices.  In this case, Plaintiff alleges that Dearborn condones the use of excessive force.  However, a threshold requirement for any *Monell* claim is an underlying constitutional violation which, for the reasons explained above, does not exist such that Count II must be dismissed.  *See*, *e.g.*, *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004); *accord Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2002).

### 3.   Count III – Assault and Battery Under Michigan Law

"Assault and battery" is an intentional tort.  To establish immunity from an intentional tort under Michigan law, Clive must show: (a) that he acted in the course of his employment and within the scope of his authority; (b) that he acted in good faith or without malice; and (c) that his acts were discretionary, as opposed to ministerial.  *Odom v. Wayne Cty.*, 482 Mich. 459, 480 (2008).  The "good faith" requirement is "subccript subjective in nature" and "protects [an officer's]

honest belief and good faith conduct with the cloak of immunity while exposing to liability [an officer] who acts with malicious intent."  *Id.* at 481-482 (underlined emphasis added).  "As long as [Clive] can show that he had a good faith belief that he was acting properly when he used deadly force, he is entitled to the protection of governmental immunity regardless of whether he was correct in that belief." *Lattis v. Phillips*, 298 Mich. App. 109, 115 (2012).

Thus, immunity for intentional torts under Michigan law is even broader than qualified immunity under federal law because it is subjective in nature and, for the reasons already explained, the *Odom* elements are easily established.  Clive acted in good faith because he used deadly force to protect himself and others from a plainly lethal threat.  Plaintiff has no evidence to establish any other motivation.  Accordingly, Count III must be dismissed.

### 4. <u>Count IV – Gross Negligence Under Michigan Law</u>

Count IV should be dismissed pursuant to Rule 12(c) because Plaintiff cannot establish "gross negligence" on these facts.  Obviously, there was nothing negligent or reckless about Clive's decision to fire.  He meant to do it and has admitted as much.  (ECF No. 12, pg. 23 ¶5; Exhibit A, pgs. 67-68).  Thus, his actions were intentional.  Michigan law does not permit plaintiffs "to transform claims involving intentional torts into claims of gross negligence." *Van Vorous v. Burmeister*, 262 Mich. App. 467, 483-84 (2004), *overruled in part on other* 21

*grounds by Odom*, supra, 482 Mich. 459 at n. 33.  Michigan law characterizes

such attempts as "artful pleading" to "avoid the protections of immunity." *Lattis*,

supra, 298 Mich. App. at 120.

### 5.   Count V – Persons With Disabilities Civil Rights Act, MCL §37.110, *et seq.*

Count V should be dismissed pursuant to Rule 12(c), too.  The Persons

With Disabilities Civil Rights Act, MCL § 37.1101, *et seq.* is an anti-

discrimination statute akin to the federal Americans with Disabilities Act.  It

prohibits discrimination in employment, housing, public accommodations,

public services, and education.  MCL § 37.1102(1). Vaguely, Plaintiff alleges that

Naji was denied public services because Clive failed to apply the department's

mental health protocol and/or because he failed to attempt to de-escalate the

encounter.  ECF No. 11, pgs. 16-18.

First, it is manifestly apparent that Naji wasn't looking for public services.

He was looking to kill someone, so how is the statute even relevant?  Second,

assuming the statute applies, how was it violated?  Naji wasn't denied entry into

the police station and when Clive asked him "How you doin?", he was offering

to provide the public services the statute contemplates.  Third, again, even if

Naji was mentally ill, Clive had no way of knowing that nor was he given a

chance to learn it.  Fourth, even if Clive knew Naji was mentally ill, "[k]nowledge

22

of a person's disability simply cannot foreclose officers from protecting themselves . . . when faced with threatening conduct by the disabled individual." *Bates ex rel. Johns v. Chesterfield Cty.*, 216 F.3d 367, 372 (4th Cir. 2000); *accord Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).

### 6. <u>Count VI – Michigan Freedom of Information Act, MCL § 15.231, *et seq* ("FOIA")</u>

Finally, Count VI should be dismissed because it is moot. Plaintiff submitted a FOIA request for: (a) the video footage and the written report of the incident; (b) prior police reports involving Naji; (c) the Department's use of force policy; and (d) police reports regarding armed civilians entering the police station between December 2018 and December 2022.

Dearborn responded to the request on January 6, 2023. It produced redacted reports regarding Naji, but it denied the request for the video footage and the incident report because producing them would have interfered with the pending investigation. MCL § 15.243(b)(1).[5] Dearborn also denied the request for the use of force policy because disclosing it would have revealed operational instructions for law enforcement officials as well as the contents of law enforcement staff manuals. MCL § 15.243(s)(v), (vi).

---

[5] Also, the incident report wasn't complete as of early January 2023 and it is further exempt from disclosure because it contains communications and notes within a public body of an advisory nature. MCL § 15.243(m).

Regarding the video, as mentioned above, on March 16, 2023, Plaintiff and his counsel were shown the relevant video footage, which did not prompt Plaintiff to amend his Complaint in any meaningful sense.  Then, on April 27, 2023, when the Court hosted the scheduling conference, defense counsel reported that Defendants intended to file an early motion for summary judgment based on the video evidence.  The Court asked Plaintiff's counsel what discovery he needed to oppose that motion, and counsel said that all he needed was Clive's deposition.  ECF No. 10 was entered.  ECF No. 10 does not allow for any discovery except Clive's deposition; in fact, it holds the entry of a scheduling order in abeyance pending the Court's decision on Defendants' motion.

The point is that if the FOIA claim was meritorious, Plaintiff would have acted once he saw the video, either by voluntarily dismissing this case or by pleading the case fairly.  Plaintiff did neither.  Nor during the scheduling conference did Plaintiff request any discovery except Clive's deposition, which counsel took on May 31, 2023.  If Plaintiff thought he needed additional discovery, he could have filed a motion seeking it - the Court made this clear during the scheduling conference.  No motion was filed, however.

So, the FOIA claim either lacks merit or it is moot.  There is no liability in this case so Defendants request that the Court either dismiss the FOIA claim on

24

mootness grounds or dismiss it without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## **CONCLUSION**

This is the weakest excessive force case defense counsel has seen in 29 years of practice.   For the various reasons explained herein, it should be dismissed in its entirety.

Respectfully submitted,

AUGUST LAW, PLLC

By:     */s/  Gary K. August*
          Gary K. August (P48730)
          Michael C. Lewis (P59139)
          Attorneys for Defendants
          29201 Telegraph Road, Suite 510
          Southfield, MI 48034
          (248) 833-6225
          gaugust@august-law.com
          mlewis@august-law.com

Dated: June 26, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2023, I filed the foregoing document with the Clerk of the Court by way of the ECF electronic filing system which will send notification of such filing to counsel for Plaintiff in this matter.

_/s/ Robin Paye_____
Robin Paye
August Law, PLLC
248-833-6225

26