UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HUSSEIN NAJI, as personal
representative of the Estate of ALI
NAJI,

      Plaintiff,

v.

CITY OF DEARBORN, *et al.*,

      Defendants.

_____ /

Case No. 23-10521

F. Kay Behm
United States District Judge

**OPINION AND ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT (ECF No. 15)**

### I.    PROCEDURAL HISTORY

On May 3, 2023, Plaintiff, Hussein Naji (Plaintiff), as personal
representative of the Estate of Ali Naji, filed this civil rights lawsuit against the City of Dearborn
and City of Dearborn police officer, Timothy Clive, arising from the shooting death
of Ali Naji (Naji) on December 18, 2022 at the City of Dearborn Police
Headquarters.  (ECF No. 1).  Plaintiff filed an amended complaint on May 8, 2023.
(ECF No. 11).  On June 26, 2023, Defendants filed a motion for summary
judgment.  (ECF No. 15).  This matter is fully briefed.  (ECF Nos. 16, 17).  The court

held a hearing via videoconference on December 20, 2023 and for the reasons set

forth below, Defendants' motion for summary judgment is **GRANTED**.

## II.    FACTUAL BACKGROUND

This case arises from a tragic incident that occurred in the lobby of the City

of Dearborn Police Headquarters on December 18, 2022, at 3:32 p.m. when

Corporal Timothy Clive ("Clive"), a 14-year veteran of the Dearborn Police

Department, shot and killed Plaintiff's decedent, 33-year-old Naji.  (ECF Nos. 11,

12; ECF No. 15-1, Exhibit A, transcript of deposition of Clive, pp. 18-19).  The

incident was captured on five surveillance cameras: (a) the "Lobby Desk" camera,

positioned above the front desk; (b) the "Lobby Doors" camera, which monitors

the main entrance directly across from the front desk; (c) the "Lobby Elevator"

camera, positioned near to and above the lobby's elevator to the right of the

front desk; (d) the "Lobby Waiting" camera, positioned above the lobby's waiting

room to the left of the front desk; and (e) the "Front Circle" camera, positioned

outside the police station's circle drive facing northwest.  (Exhibits B1-B5).

Defendants' motion is based primarily upon the Lobby Elevator footage - 3:32:38-

3:33:02 (a period of 24 seconds) - because this section of footage depicts the

movements of both men.

Clive was working the "position-1 desk" in the rear of the police station. (ECF No. 15-1, p. 73).  Between the other police officers and civilian staff on duty/working that afternoon, there were eleven or so people in the police station at the time of the shooting.  (ECF No. 15-1, p. 92). Though December 18, 2022 was a Sunday, the police station was busy because members of the public were dropping off/picking up Christmas gifts in support of the police department's "No Child Without a Christmas Toy Drive."  (ECF No. 15-1, pp. 89-91).  Clive described December 18, 2022 as "one of the more busy Sundays I ever worked."  (ECF No. 15-1, p. 91).  At the time of the incident, there were no members of the public in the lobby of the City of Dearborn Police Headquarters.  (ECF No. 15-1, PageID.192).  Clive could not recall when the last civilian was in the lobby before Naji entered the station.  (ECF No. 15-1, PageID.195).

At 3:32:38 p.m., Naji entered the lobby through the front door.  He was darkly dressed, wearing black pants, a black jacket, a black winter hat, and a Covid-style face mask.  (Exhibit B3, Lobby Elevator, 3:32:38).  Clive saw Naji enter the lobby via a closed-circuit television mounted near the position-1 desk.  (ECF No. 15-1, pp. 73-74).  He then walked to the front desk and greeted Naji, asking him "How you doin?"  (ECF No. 15-1, pp. 74-75, 93; Exhibit B1, Lobby Desk, 3:32:48).  Naji, using his right hand, removed a handgun from his rear waistband,

pointed it at Clive, and pulled the trigger.  (ECF No. 15-1, pp. 93-94; Exhibit B3, Lobby Elevator, 3:32:48 – 3:32:50).  The gun malfunctioned and no bullet was fired.  The Lobby Elevator footage shows a portion of Clive's body jumping back when Naji produced the gun.  (Exhibit B3, Lobby Elevator, 3:32:50).  Naji then attempted to correct the gun's malfunction by reloading the magazine and pulling back on the weapon's slide so as to rack a bullet into the chamber.  (ECF No. 15-1, p. 94; Exhibit B3, Lobby Elevator, 3:32:51-3:32:56).

When Naji produced the gun, Clive shouted "gun, gun, gun, . . ." to alert his colleagues of the emergency.  (ECF No. 15-1, p. 82; Exhibit B1, Lobby Desk, Exhibit B2, Lobby Doors, 3:32:51-3:32:55).  When Naji pulled the trigger, Clive heard it "click."  (ECF No. 15-1, p. 94).  Clive then watched Naji reload the magazine and pull back on the weapon's slide.  (ECF No. 15-1, p. 94).  He believed Naji "was in the process of fixing a malfunction to kill myself or to kill anybody else that entered that lobby." (ECF No. 15-1, p. 95).  Clive slid open the front desk window and fired seventeen shots in a continuous, 4-5 second volley (ECF No. 15-1, pp. 69, 81, 85-86; Exhibit B3, Lobby Elevator, 3:32:56 – 3:33:01).  It is unclear how many shots struck Naji, but it appears that Clive's first shot – perhaps his first two shots – missed Naji and instead struck and shattered a window of the front vestibule.  (Exhibit B2, Lobby Doors, 3:32:57).  Naji fell to the ground early in the

shot sequence.  From a review of the audio and video, it looks and sounds as though six shots were fired before Naji was on the ground.  (Exhibit B1, 3:32:56-58; Exhibit B3, 3:32:58).  Clive "never saw [Naji] drop the gun" though he did see Naji "rearing up onto his right side" as if "he was still going to try to shoot and kill me."  (ECF No. 15-1, pp. 95-96; Exhibit B3, Lobby Elevator, 3:32:57 – 3:33:00).  At the point where Naji appeared to stop "rearing up on his right side," 14 shots had been fired.  (Exhibit B3, 3:33:00; Exhibit B1 3:33:00).  Clive continued to fire until he "thought the threat was neutralized."  (ECF No. 15-1, p. 96).  The last three shots ended less than two seconds after the point where Naji appeared to stop rearing up on his right side.  (Exhibit B1 3:33:01:754).

On the Lobby Waiting camera, Naji can be seen losing control of the gun around the same time the window shatters.  (Exhibit B4, Lobby Waiting, 3:32:57). His gun came to rest at the base of the front door (behind the signpost).  (Exhibit B2, Lobby Doors, 3:32:57 forward).  From the time Naji entered the lobby to the time Clive opened fire, 18 seconds passed.  (Exhibit B3, Lobby Elevator, 3:32:38 – 3:32:56.  There are six separate entrances into the lobby: (a) through the door Naji used, i.e., the public entrance; (b) through the door on the right side of the front desk which leads down into the lobby; (c) through a more secure door to the right of and behind the front desk; (d) off an elevator, also to the right of the front

desk; (e) through a door to the left of the front desk which leads from the records department; and (f) via the lobby stairwell.  (ECF No. 15-1, pp. 92-93).

Plaintiff denies that Clive knew Naji's intent was to kill the officer or to kill anybody else that entered the lobby.  While Plaintiff acknowledges that Naji brandished his firearm about 11 seconds after he entered the lobby, Plaintiff argues that it is unclear whether Naji directly pointed the gun at the officer because Clive was behind the bullet resistant glass in the lobby and there was no immediate risk to himself or to others.  Two seconds later, there is a pause as Naji examines his gun.  Plaintiff maintains that Clive shot Naji when he did not pose a serious threat.  This is so, according to Plaintiff, based on the five to seven second gap when Clive observed Naji and the weapon before he fired at Naji and he failed to implement any de-escalation measures or give Naji any verbal commands.  (ECF No. 15-1, p. 88:15-18, p. 190).  Plaintiff also suggests that Clive could not legitimately have been in fear for his life because he was behind bullet resistant glass, he was not aware that it could be penetrated by a projectile, and he proceeded to open the window and discharge his firearm.  (ECF No. 15-1, pp. 191-192).  According to Plaintiff, if Clive felt unsafe or under threat, he would not have opened the window to shoot Naji.  Plaintiff also contends that, contrary to Clive's testimony, the video of the incident does not unequivocally indicate that

Naji was "rearing on his right side" as if "he was still going to try to shoot" after having been shot by Clive.  (ECF No. 15-1, PageID.194).

III.   **ANALYSIS**

A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  However, when the record contains "a videotape capturing the events in question," the court may not adopt a "version of the facts for purposes of ruling on a motion for summary judgment" that "blatantly contradict[s]" the asserted version of events such that "no reasonable jury could believe it."  *Raimey v. City of Niles, Ohio*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  And the court must "nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.'" *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).  Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004).  In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248;

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However,

mere allegations or denials in the non-movant's pleadings will not satisfy this

burden, nor will a mere scintilla of evidence supporting the non-moving

party.  *Anderson*, 477 U.S. at 248, 251.

In the use-of-force context, "once the relevant set of facts is determined

and all reasonable inferences are drawn in favor of the plaintiffs, to the extent

supported by the record, the question of whether the [officers'] actions were

objectively unreasonable is 'a pure question of law.'"  *Chappell v. City of

Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. at

381 n.8; and citing *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)).  But "*if

there is some evidence – more than a mere scintilla of evidence – that [the

plaintiff], through his conduct, judged from the perspective of reasonable officers

on the scene, did not give the officers probable cause to believe that he posed a

serious threat of harm, a genuine fact dispute is created.*"  *Chappell*, 585 F.3d at

909 (emphasis in original).

B.    Fourth Amendment Excessive Force

Qualified immunity protects government officials from liability for civil

damages "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts undertake a two-pronged inquiry to determine an officer's entitlement to qualified immunity in the excessive force context, examining both: "(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident."  *Estate of Hill ex rel. Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (citation omitted).  The two prongs can be addressed in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Qualified immunity shields an officer's actions if either inquiry is answered in the negative.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

In reviewing an excessive force claim, the court "limit[s] the scope of [its] inquiry to the moments preceding the shooting."  *Leftwich v. Driscoll*, 2023 WL 3563207, at *2 (6th Cir. May 19, 2023) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)).  Although Plaintiff bears the burden of demonstrating that Clive is not entitled to qualified immunity, the court views all facts in the light most favorable to Plaintiff.  *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citation omitted).  If there is video evidence, the court takes the facts "in the light depicted by the videotape."  *Leftwich*, at *2 (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).  However, if the video evidence "can be interpreted in multiple ways

or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id*. (quoting *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)).

The use of deadly force is objectively unreasonable "unless an officer has probable cause to believe a suspect poses an immediate threat of serious physical harm to the officer or others." *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. at 7. The Fourth Amendment guarantees citizens the right to be free from unreasonable seizures, and a court must look to the totality of the circumstances to determine whether an officer used excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "To determine if an officer's use of force violates the Fourth Amendment, courts apply an objective reasonableness standard, considering an officer's actions 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Lunneen v. Village of Berrien Springs, Michigan*, 2023 WL 6162876, at *4 (6th Cir. Sept. 21, 2023) (quoting *Graham v. Connor*, 490 U.S. at 396-97). As explained in *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022), when considering the "totality of the circumstances," the Supreme Court has

articulated three factors as a starting point: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 313 (6th Cir. 2017) (quoting *Graham*, 490 U.S. at 396). This list is not, however, exhaustive. *Palma*, 27 F.4th at 428-429 (citing *Roell v. Hamilton Cnty.*, 870 F.3d 471, 480 (6th Cir. 2017)); *see also Zuress v. City of Newark, OH*, 815 F. App'x 1, 6 (6th Cir. 2020) ("The *Graham* factors are not exhaustive."). The reasonableness inquiry "is an objective one" that does not account for an officer's "evil" or "good" intentions and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Leftwich*, at *2 (quoting *Graham v. Connor*, 490 U.S. at 396-97 (citations omitted)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Defendants argue that the *Graham* factors favor Clive. They contend that Naji committed attempted murder of a police officer and was an immediate ongoing threat to Clive and anyone else who walked in the lobby, which was

heavily trafficked that day by the public.  Defendants note that the third *Graham*

factor – resisting or evading – does not apply given the circumstances.  Plaintiff,

on the other hand, disputes that Naji committed the crime of attempted murder.

According to Plaintiff, this is so because Clive was behind bullet resistant glass and

because Naji suffered from mental illness and his actual intent cannot be known.

As to the first *Graham* factor – the seriousness of the crime – it was

objectively reasonable for Clive to perceive that Naji, who was pointing the gun in

his direction and attempting to fire it, intended to cause him bodily harm or to kill

him.  However, contrary to Plaintiff's argument, Naji's subjective intent is not

relevant to this analysis because his motives would not be known to a reasonable

officer at the time of the incident.  *See Murray-Ruhl v. Passinault*, 246 F. App'x

338, 350 (6th Cir. 2007) ("the subjective intent of the victim—unavailable to the

officers who must make a split-second judgment—is irrelevant to the question

whether his actions gave rise to a reasonable perception of danger.").  Moreover,

the question is not whether Naji had any ill intent when pointing a weapon at

Clive; rather the question "is whether a reasonable officer in [defendant's] shoes

would have feared for his life, not what was in the mind of [the plaintiff] when he

turned [the corner] with [a] gun in his hand."  *Hicks*, 958 F.3d at 436 (quoting *Bell*

*v. City of East Cleveland*, 1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997)).

The presence of bullet resistant glass also does not appear to undercut the perceived nature of the crime.  While the court was not able to find any cases in this context regarding the presence of bullet proof or bullet resistant glass, courts have held in the armed robbery context that firing a weapon at someone behind bullet proof glass is "reasonably calculated to put life in danger."  *United States v. Johnson*, 401 F.2d 746, 747 (2d Cir. 1968) (per curiam) (holding defendant who shot at drive-up bank teller not entitled to defense that teller's life was never in danger because bullet failed to penetrate bullet-proof glass at teller window); *see also United States v. Whitfield*, 695 F.3d 288, 304 n.11 (4th Cir. 2012) (joining the Second and Eleventh Circuits "in rejecting the contention that bank tellers are not jeopardized simply because they are situated behind 'bulletproof' glass"). Accordingly, the seriousness of the crime factor weighs strongly in favor of finding that the use of deadly force was not excessive.

As to the second *Graham* factor – whether the suspect poses an immediate threat to the safety of the officers or others – Plaintiff suggests that this case falls in the category of cases where deadly force is unjustified because the suspect merely possessed a weapon.  More specifically, Plaintiff contends that there is a question of fact regarding whether Naji posed an immediate threat to Clive or others based on the following: Clive had no recollection when the last civilian was

in the police station before Naji had come in (ECF No. 15-1, PageID.195); no bullet was ever fired at Clive (ECF No. 15-1, PageID.190); and Clive opened the front desk window to engage Naji directly.  It is true that "merely possessing a weapon" does not justify deadly force.  *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019). Instead, "the reasonableness of an officer's asserted fear will often turn on whether an armed suspect pointed her weapon at another person."  *Hicks v. Scott*, 958 F.3d 421, 435-36 (6th Cir. 2020) (citing *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000) ("[T]he issue that is material here is ... whether [the suspect] pointed his weapon at the officers and thus posed an immediate threat to them."); *David v. City of Bellevue*, 706 F. App'x 847, 851 (6th Cir. 2017) ("The key fact ... is whether [the suspect] had his gun pointed at the officers."); *Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016) ("Time and time again, we have rejected Fourth Amendment claims ... when the officers used deadly force only after the suspect[ ] had aimed [her] gun[ ] at [them] ...."))  Further, if a suspect possessed a gun, courts generally deny qualified immunity *only* if there is a genuine dispute of fact as to whether the gun was pointed at someone.  *Hicks*, 958 F.3d at 436 (citing *King v. Taylor*, 694 F.3d 650, 662-63 (6th Cir. 2012) (denying qualified immunity based on dispute as to where gun was pointed)).  Notably, the Sixth Circuit has rejected a "categorical rule that force can only be

reasonable if a suspect raises his gun." *Thornton v. City of Columbus*, 727 F. App'x

829, 838 (6th Cir. 2018) (quoting *Thomas v. City of Columbus, Ohio*, 854 F.3d 361,

366 (6th Cir. 2017)).

Here, based on the video evidence, there is no genuine dispute that Naji

pointed his firearm at Clive, attempted to discharge the weapon but it

malfunctioned, and then attempted to correct the gun's malfunction by reloading

the magazine and pulling back on the weapon's slide to rack a bullet into the

chamber. (ECF No. 15-1, p. 94; Exhibit B3, Lobby Elevator, 3:32:51-3:32:55).

Plaintiff argues that Clive should have retreated at this point because Naji's

weapon appeared to not be working, but Plaintiff offers no case law suggesting

that an officer facing an armed suspect in these circumstances has a duty to

retreat instead of using deadly force. Sixth Circuit case law suggests that an

officer generally has no duty to retreat in these circumstances, but the availability

of an exit may be considered in the totality of the circumstances. *See e.g.*,

*Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 674 (6th Cir. 2020) ("While Rhodes

had no duty to retreat from the vehicle, his entry into the vehicle and the

availability of an exit speak to the totality of the circumstances informing his use

of deadly force."); *see also Nicholson v. Kent Cty. Sheriff's Dep't,* 839 F. Supp. 508,

516 (W.D. Mich. 1993) (Police officers have no duty to retreat before using deadly

force once a suspect starts and continues a fight.). Here, had Clive retreated, he would have left an armed man who appeared willing to use his firearm alone in the police station lobby where members of the public, other officers, and staff could enter at any moment. It is not reasonable to expect Clive to simply retreat and potentially allow Naji to endanger members of the public, other officers, and staff.

As to Plaintiff's claim that Clive had the opportunity to give verbal commands or implement other de-escalation measures, the sequence of events leading to the use of deadly force is critically important and undercuts this argument. Naji points his gun at Clive at 3:32:49-50. (Exhibit B3). Clive then goes to retrieve his gun. He returns to the window at 3:32:55 and reaches the window to open it at 3:32:56, approximately six to seven seconds after Naji initially tries to shoot his gun. *Id*. At 3:32:56, Clive starts shooting while in those same two seconds (3:32:55-56), Naji has his gun pointing at about a 45-degree upward angle toward Clive and is pulling back the weapon's slide and turning the barrel directly toward Clive. *Id*. Plaintiff's argument suggests that Clive should have declined to retrieve his gun and instead, maintained his position in the face of an armed suspect actively pointing a weapon at him and trying to shoot in order to give a verbal warning. Plaintiff offers no case law in support of this notion and the court

finds that suggestion unreasonable.  This conclusion is supported by *Hicks v. Scott*, where the Sixth Circuit held that the "only inquiry that matters is whether, in the 'moment' before using deadly force, an officer reasonably perceived an immediate threat to [his] safety." *Id*. at 437.  Where an officer reasonably perceived such a threat, he was not required to give a warning.  *Id*.  This is so where the "hesitation involved in giving a warning could readily cause such a warning to be [the officer's] last," then a warning is not feasible.  *Id.* (quoting *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994)).  In *Hicks*, the court found that it "was not feasible for Scott—unexpectedly confronted with the barrel of a rifle from five feet away—to give a warning before firing her weapon." *Id*.  The court finds the same is true here: given the perceived threat posed by Naji and the fast-paced sequence of events, no warning was reasonably feasible.[1]

And, to the extent that Plaintiff argues that the 17 shots were necessarily excessive, the sequence of events again belies this argument.  From a review of the audio and video, it looks and sounds as though six shots were fired before Naji was on the ground.  (Exhibit B1, 3:32:56-58; Exhibit B3, 3:32:58).  Clive "never saw [Naji] drop the gun" though he did see Naji "rearing up onto his right side" as if

---

[1] Plaintiff's attempt to tie Naji's mental health to the Police Department's de-escalation policy is unavailing because there is no evidence in the record that Clive was aware that Naji suffered from any mental illness.

"he was still going to try to shoot and kill me."  (ECF No. 15-1, pp. 95-96; Exhibit

B3, Lobby Elevator, 3:32:57 – 3:33:00).  Plaintiff argues that the video of the

incident does not unequivocally indicate that Naji was "rearing on his right side"

as if "he was still going to try to shoot" after having been shot by Clive.  (ECF No.

15-1, PageID.194).  Given the rapidly unfolding events, it is not objectively

unreasonable for an officer on the scene in those circumstances to perceive Naji's

movements as a continuing threat.  At the point where Naji appeared to stop

"rearing up on his right side," 14 shots had been fired.  (Exhibit B3, 3:33:00;

Exhibit B1 3:33:00).  Clive continued to fire until he "thought the threat was

neutralized."  (ECF No. 15-1, p. 96).  The last three shots ended less than two

seconds after the point where Naji appeared to stop rearing up on his right side.

(Exhibit B1 3:33:01:754).  This entire sequence lasted between five and six

seconds.  Clive discharged 14 of the 17 shots when Naji appeared to stop "rearing

up on his right side" and the remaining three shots were fired in less than two

seconds after that point.  Less than two seconds is an objectively reasonable

reaction time for Clive to stop shooting and when he could have perceived that

Naji was no longer a threat.  *See Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir.

2015) (citing *Untalan v. City of Lorain*, 430 F.3d 312, 315–16 (6th Cir. 2005)

(finding police officer's use of deadly force reasonable where only a "few

seconds" passed between when assailant lost control of knife and when officer

shot assailant); *Troupe v. Sarasota County*, 419 F.3d 1160, 1168 (11th Cir. 2005)

(finding that 3–5 seconds was a short enough time for the use of deadly force to

stop someone who previously endangered police and bystanders even if, in

hindsight, the facts show that members of the S.W.A.T. Team could have escaped

unharmed); *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (holding

that an Officer's decision to shoot within a reaction time of 2.72 seconds was

reasonable, even if hindsight showed that the officer could have escaped

unharmed); *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (justifying

use of deadly force in the "very few seconds" after a serious threat had subsided);

*McLenagan v. Karnes*, 27 F.3d 1002, 1007–08 (4th Cir. 1994) (justifying the use of

deadly force against an unarmed, handcuffed suspect when an officer reasonably

believed that a fellow officer had seen a gun in the suspect's hands, in large part

because the officer "had no time to consider anything at all")).

Plaintiff's reliance on *Lopez v. City of Cleveland*, 625 F. App'x 742, 743 (6th

Cir. 2015) does not alter this analysis.  In *Lopez*, the court found material factual

disputes regarding the movements Lopez may have made just before the

shooting.  *Id*. at 746.  The officers on scene testified that Lopez raised his machete

turned toward Lopez's sister, while another witness on the scene testified that

Lopez turned toward her with the machete at his side.  Further, one witness

testified that Lopez raised his machete and turned toward a different person, and

yet another witness said he did not turn in either direction.  *Id*.  Here, there is

videotape of the entire incident and no contradictory evidence or issues regarding

any "gaps" in the sequence of events.  Thus, *Lopez* is distinguishable and not

controlling here because it did not involve video evidence or a person armed with

a gun, and there is no dispute, unlike in *Lopez*, that Naji raised his weapon.

Here, taking the facts "in the light depicted by the videotape" per *Scott v.*

*Harris* and construing all facts not depicted in the video in the light most favorable

to Plaintiff, the court is unable to find sufficient material evidence suggesting that

Naji "through his conduct, judged from the perspective of reasonable officers on

the scene, did not give the officers probable cause to believe that he posed a

serious threat of harm" such that a genuine issue of fact has been created.

*Chappell*, 585 F.3d at 909.  Instead, considering the totality of the circumstances,

the court finds that Clive's use of deadly force was objectively reasonable and

necessary to protect both Clive and other officers and staff onsite.  The court also

emphasizes the importance of Clive's actions to protect the public, given that a

member of the public could have entered the police station lobby at any time on

a busy Sunday during a Christmas toy drive while Naji was armed and actively

trying to discharge his weapon.  For these reasons, despite the tragic and

unfortunate circumstances that unfolded on December 18, 2022, Plaintiff's Fourth

Amendment excessive force claim must fail as a matter of law.  Because of this

conclusion, the court need not consider the second prong of the qualified

immunity test – whether Clive's actions were contrary to clearly established law

at the time he acted.

    C.    <u>*Monell* Claim</u>

"To prevail in a § 1983 suit against a municipality, a plaintiff must show that

the alleged federal right violation occurred because of a municipal policy or

custom."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (citing *Monell v.

Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  In other words, "[a] municipality

'may not be sued under § 1983 for an injury inflicted solely by its employees or

agents.'"  *Id*. (quoting *Monell*, 436 U.S. at 694).  There are four traditional ways of

proving the existence of an illegal policy or custom: "(1) the existence of an illegal

official policy or legislative enactment; (2) that an official with final decision

making authority ratified illegal actions; (3) the existence of a policy of inadequate

training or supervision; or (4) the existence of a custom of tolerance or

acquiescence of federal rights violations."  *Wright v. City of Euclid, Ohio*, 962 F.3d

852, 880 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 828

(6th Cir. 2019)).

However, if there is no underlying constitutional violation, then there can

be no *Monell* liability.  As the court explained in *Ashcroft v. Iqbal*, 556 U.S. 662,

767 (2009), there is no vicarious or *respondeat superior* liability under § 1983.

Thus, for example, in the context of a municipality, a plaintiff cannot establish the

municipality's liability unless he shows that "deliberate action attributable to the

municipality directly caused a deprivation of federal rights."  *Board of County*

*Comm. V. Brown*, 520 U.S. 397, 415 (1997).   Rather, in the context of a claim

against a municipality, a plaintiff must establish both (1) an underlying violation of

his constitutional rights, and (2) that the violation resulted from the municipality's

own deliberately indifferent policies.  *See Collins v. City of  Harker Height*s, 503

U.S. 115, 120 (1992) (explaining that "proper analysis requires us to separate two

different issues when a § 1983 claim is asserted against a municipality: (1)

whether plaintiff's harm was caused by a constitutional violation, and (2) if so,

whether the city is responsible for that violation."); *City of Los Angeles v. Heller*,

475 U.S. 796, 799 (1986) (*per curiam*) ("If a person has suffered no constitutional

injury at the hands of the individual police officer, the fact that the departmental

regulations might have authorized the use of unconstitutionally excessive force is

quite beside the point."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th

Cir. 2001) ("If no constitutional violation by the individual defendants is

established, the municipal defendants cannot be held liable under § 1983.")

(citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Nallani v.*

*Wayne County*, 2015 WL 6795945 (E.D. Mich. Nov. 6, 2015) (dismissing defendant

Wayne County because plaintiff failed to establish a constitutional violation by

the individual defendants)).  As set forth above, Plaintiff has not established that

Clive violated Naji's constitutional rights.  Accordingly, the *Monell* claim too must

fail.

      D.    <u>Assault and Battery</u>

      "Under Michigan law an assault is 'an attempt to commit a battery or an

unlawful act which places another in reasonable apprehension of receiving an

immediate battery.'" *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (citing

*People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004)).  "A battery is 'an

unintentional, unconsented and harmful or offensive touching of the person of

another, or of something closely connected with the person.'" *Id*. (quoting

*Nickens*, 685 N.W.2d at 661).  An officer does not commit an assault or battery

when using reasonable force to effectuate an arrest, although the officer may be

liable for assault and battery if unjustifiable force is used.  *Bennett v. Krakowski*,

671 F.3d 553, 560-61 (6th Cir. 2011) (citations omitted); *VanVorous v. Burmeister*,

687 N.W.2d 132, 141 (Mich. Ct. App. 2004) (quoting *Brewer v. Perrin*, 349 N.W.2d

198 (Mich. Ct. App. 1984)) ("It is well-established in our state's jurisprudence that

'a police officer may use reasonable force when making an arrest.'").

Unlike the objective test applied in the context of a § 1983 Fourth

Amendment claim for judging whether the force used was reasonable, a

subjective test is used in the context of an assault and battery claim under

Michigan law.  *Tomlin v. Percy*, 2023 WL 4095232, at *9 (E.D. Mich. June 20, 2023)

(citing *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (citing *Odom v. Wayne

Cnty.*, 760 N.W.2d 217, 229 (Mich. 2008))).  "Thus, an officer who believed in good

faith that the force used was necessary is protected from liability for an assault

and battery claim; whereas, an officer who acted with malicious intent is not."  *Id*.

"Michigan law affords officers greater protection than federal law."  *Marshall v.

City of Farmington Hills*, 693 F. App'x 417, 431 (6th Cir. 2017) (Griffin, J.,

concurring in part and dissenting in part) (citing *Bletz*, 641 F.3d at 757-58).

As explained in detail above, the force used by Clive was reasonable as a matter

of law.  Accordingly, he is also entitled to summary judgment with respect to

Plaintiff's assault and battery claim.  *Tomlin*, at *9 (citing *Estate of Hill v. Miracle*,

853 F.3d 306, 318 (6th Cir. 2017) (concluding that the defendant is entitled to

governmental immunity on the plaintiff's state-law claim of assault and battery because the record reflected that the defendant "acted in an objectively reasonable manner with the minimum force necessary to bring [the plaintiff] under control"); *Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 43 (6th Cir. 2005) (concluding that, because "the officers' use of force ... was reasonable and justified ... the assault and battery claim cannot stand")).

E.    Gross Negligence

Plaintiff's gross negligence claim is barred by *Bletz v. Gribble*, in which the Sixth Circuit held that a plaintiff's allegations of excessive and intentional force could not support a separate claim of gross negligence under Michigan law because they were "fully premised" on his intentional tort claims. *Id.* at 756.  The court reasoned that "[a]lthough establishing that a governmental official's conduct amounts to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action." *Id*. Accordingly, when a court is faced with claims of gross negligence, it must look "beyond the procedural labels in the complaint and determine the exact nature of the claim" and "[e]lements of intentional torts may not be transformed into gross negligence claims."  *Norris v. Police Officers*, 808 N.W.2d 578 584 (Mich. App. 2011).  Plaintiff admits that his gross negligence claim is based on the same facts

as excessive force and assault and battery claims.  Accordingly, his gross

negligence claim fails as a matter of law.

F.     FOIA and ADA

Plaintiff does not respond to Defendants' arguments regarding his claims

under the ADA and FOIA.  Accordingly, he has abandoned these claims.  *See Doe*

*v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (stating that the district court

"correctly noted … that [plaintiff] abandoned [certain] claims by failing to raise

them in his brief opposing the government's motion to dismiss the complaint");

*PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 88 F. Supp. 3d 775, 785 (E.D. Mich.

2015) ("A plaintiff abandons undefended claims."); *Mekani v. Homecomings Fin.,*

*LLC*, 752 F. Supp. 2d 785, 797 (E.D. Mich. 2010) (stating that where a plaintiff fails

to respond to an argument in a motion to dismiss, "the Court assumes he

concedes this point and abandons the claim").

G.     Rule 11 Sanctions

Defendants contend that Plaintiff's complaint and amended complaint

violate Federal Rule of Civil Procedure 11 because Plaintiff fails to admit that Naji

was armed and attempted to shoot Clive.  Rule 11 precludes filing a motion for

sanctions for an alleged violation until the expiration of 21 days after service (but

not filing) of the motion.  *Kenyon v. Union Home Mortg. Corp.*, 2022 WL 621552,

at *2 (N.D. Ohio Mar. 3, 2022) (citing Fed. R. Civ. P. 11(c)(2)).  The safe harbor

provision allows an attorney the opportunity to correct any improper claim or

representation without involving a court and promotes some minimal degree of

professionalism and civility.  *Id*.  Here, it just appears that Defendants' counsel

requested concurrence in the relief sought in the motion for summary judgment,

and then filed the motion.  (ECF No. 15, PageID.131).  Nothing suggests that the

motion was served 21 days before filing.  Thus, Defendants did not comply with

the safe harbor procedure for requesting sanctions under Rule 11 and it also

improperly included its request for sanctions as part of its motion for summary

judgment, instead of filing a "motion for sanctions[, which] must be made

separately from any other motion."  Fed. R. Civ. P. 11(c)(2).  Accordingly, the

request for sanctions under Rule 11 must be denied.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the court **GRANTS** Defendants' motion for

summary judgment and **DENIES** Defendants' request for Rule 11 sanctions.

**SO ORDERED**.

Date: December 29, 2023                    s/F. Kay Behm
                                           F. Kay Behm
                                           United States District Judge