**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**HUSSEIN NAJI, as personal**
**representative of the Estate of**
**ALI NAJI,**

                    Plaintiff,          Case No. 23-10521
   -v-

**CITY OF DEARBORN, et al.,**

                    Defendant.
_____/

**MOTION HEARING (Via Zoom)**
BEFORE THE HONORABLE F. KAY BEHM
     United States District Judge
          600 Church Street
          Flint, Michigan
     Wednesday, December 20, 2023

APPEARANCES:

FOR THE PLAINTIFF:   CYRIL C. HALL
                     AMIR I. MAKLED
                     Hall Makled, PC
                     23950 Princeton Street
                     Dearborn, MI 48124

FOR THE DEFENDANT:   MICHAEL C. LEWIS
                     GARY K. AUGUST
                     August Law, PLLC
                     29201 Telegraph Road, Suite 510
                     Southfield, MI 48034

                     BRADLEY J. MENDELSOHN
                     JEREMY J. ROMER
                     City of Dearborn Department of Law
                     16901 Michigan Ave., Suite 14
                     Dearborn, MI 48126

        <u>To Obtain a Certified Transcript Contact:</u>
             Christin E. Douglas
        FCRR, RDR, CRR, CSR - (248) 420-2720
             www.transcriptorders.com

# TABLE OF CONTENTS

Motion Hearing                                                Page
  Argument by Mr. Lewis                                         5

  Argument by Mr. Hall                                         29

  Rebuttal by Mr. Lewis                                        41

EXHIBITS:
    (None Offered.)

CERTIFICATE OF REPORTER                                        47

Flint, Michigan

December 20, 2023

2:05 p.m.

*     *     *

THE COURT:  Good afternoon, everybody.  I have a number of people here.  I guess I would like to call the case, and then I'd like you to tell me who you are and who you are representing at this point.

So we have the matter of Naji vs. City of Dearborn, et al.  The case number is 23-10521.

And it looks like I have maybe Mr. Mendelsohn here.  Sir, who are you representing?

MR. MENDELSOHN:  Good afternoon, your Honor.  The defendants, City of Dearborn and the officer.

THE COURT:  Okay.  And it looks like I have, it says Cyril Hall.  And there's two gentlemen sitting at the table.  If you could maybe identify yourselves, please.

MR. HALL:  Thank you very much.  Cyril Hall and Amir Makled on behalf of the plaintiffs.

MR. MAKLED:  Thank you.

THE COURT:  And your name, sir?

MR. MAKLED:  Thank you, Judge.  I'm Amir Makled.

THE COURT:  Okay.  My apologies.  Plaintiff.  Okay.

And then, Mr. August, I have you on the pleadings representing the defendant, correct?

MR. AUGUST:  That's correct, along with my partner, Mr. Lewis, who will be arguing the matter.

MR. LEWIS:  Good afternoon, Judge.

THE COURT:  Good afternoon.

And then, Mr. Romer, who are you here on behalf of?

MR. MENDELSOHN:  I'm here on behalf of the City of Dearborn and the named officer.

THE COURT:  So you represent the defendant as well.

Okay.  So for the plaintiff, we have Mr. Makled and Mr. Hall.  For the defendant, we have Mr. August, Romer, Lewis and Mendelsohn.  And it sounds like Mr. Lewis will be arguing on behalf of the defendant.

And, Mr. Makled, will you be arguing on behalf of the plaintiff?

MR. MAKLED:  Mr. Hall will be arguing on behalf of the plaintiff, your Honor.  Thank you.

THE COURT:  All right.  Sounds good.

All right.  So we are here today for the defendant's motion for summary judgment.  I have had a chance to review your pleadings.  And I also note that I have Mr. Hall, that you have not filed an appearance in this case.

MR. HALL:  Your Honor?

MR. MAKLED:  He's on the pleadings.

MR. HALL:  I thought I was on the pleadings.  It's Hall & Makled Law Firm.

THE COURT:  All right.  Does anyone have any objections to Mr. Hall arguing today, just given there may be some confusion in that regard.  Mr. Lewis?

MR. LEWIS:  I do not, your Honor.  I do not.

THE COURT:  All right.  All right.  Then we'll go ahead and let Mr. Hall address that and maybe look into it after today's hearing.

If I were you, I'd reach out to my case manager, Ms. MacKay, Kristen MacKay, that even though you're on the pleadings, we don't have an appearance for you, sir.  So I would strongly suggest you look into that, please.

MR. HALL:  That's fine, your Honor.  But I'm satisfied the Court also noted that I took the deposition, and that's been attached to the pleadings, that I was counsel at that point in time, too.

THE COURT:  I understand.  If I were you, I would reach out to my case manager, Kristen, because she is telling me that you have not filed an appearance despite all of that.  So you should check that out and make sure you're doing everything that you need to do.

MR. HALL:  Thank you, Judge.

THE COURT:  All right.  Let's go ahead and address arguments.  Mr. Lewis, if you would like to argue the defendant's position, please.

MR. LEWIS:  Thank you, Judge Behm.  We appreciate you

scheduling this hearing. And happy holidays to you and your staff.

Your Honor, this is a -- the First Amended Complaint contains I believe six separate counts, so there is some material to move through here. I intend to be, hope to be as brief as possible, given all of that material, because I know the Court is well prepared.

Your Honor, I think this is a case that, that really beggar's description. There is no police case like it that I've seen in 25 years of doing litigation work. Not all of that time doing police work, but I've handled a number of police matters, and I've never seen a case quite like this police case.

As the Court knows, and as the video evidence demonstrates, this case involves the ambush -- and ambush is really the only word I can think of to describe it -- the ambush and the attempted murder of Officer Timothy Clive on December 18th, 2022, just one year and two days ago now.

Because this incident occurred in the lobby of the Dearborn Police headquarters, the entire beginning, end, stem to stern, was captured on videotape, which is important in this case. It's always important to have video evidence in police cases, but it's crucially important in this case, in my opinion because Plaintiff is apparently willing or attempting to simply skate over, skate by the reality that Ali Naji was armed on

December 18, 2022, and that he attempted to shoot Timothy Clive without any warning or provocation whatsoever.  The videotape clearly shows that ambush, your Honor.

So this case is not about a clash of witnesses, it's not about dueling facts, it's not about dueling affidavits. It's not about different versions of events.  This case is simply about how the law applies to the undisputed facts that are shown on that video evidence.  And when you apply the law, the federal and state law, that, the term I use in that brief is that great gray ocean of police law that is out there, when you apply that law to the footage on that videotape, the conclusion is inescapable, your Honor, that this entire case should be dismissed without -- with prejudice immediately, and that Plaintiffs ought to be sanctioned for filing a frivolous complaint.

Qualified immunity, your Honor, very briefly, is a doctrine that's been around since approximately 1980, 1981, something like that.  There are a number of cases that, that really round out the qualified immunity doctrine.  *Harlow vs. Fitzgerald* is a big one, *Mitchell vs. Forsythe,* and there are others.  *Graham vs. Connor* is a huge one, too.

Qualified immunity is a doctrine that encourages courts to look at motions for summary disposition in police cases as soon as possible because the doctrine is not simply a defense to liability.  It is -- it is that, and that is

significant, but it is more than that.  And that "more" is that it is also an immunity from suit.  It is an immunity from the burdens of litigation.  It is an immunity that gets police officers out from under bad lawsuits so they can go back to being police officers, rather than sitting in depositions and attending trials.  I think that's critically important to point out on these facts, is that qualified immunity is not just a defense to liability.  It is an immunity from suit.  It is a defense designed to aid the effective functioning of government, which is a term you see sometimes in the cases.

The central purpose of qualified immunity is to protect officers from the undue interference with their duties and from potentially disabling threats of liability.  Qualified immunity, in short, your Honor, is meant to allow police officers to get back to doing their jobs.

When it comes to qualified immunity, this is an important point as well, your Honor, Plaintiff, it is the plaintiff in a 1983 excessive force case that has the burden of demonstrating that the defendant officer is not entitled to qualified immunity.  So the burden is on Plaintiff in this case.  It is not on Defendant.  It is on Plaintiff to prove that the defense is not available.  And that's simply not going to be possible, in my judgment, on these facts.

So I would like to move through the First Amended Complaint count by count.  The first count is the Fourth

Amendment count. This count is -- it's governed by the two-part qualified immunity test. The first piece of that two-part test is that the officer's conduct must violate the Fourth Amendment. And that is evaluated under what is known as the objective reasonableness test of *Graham vs. Connor*, the 1989 Supreme Court case which really shapes this area of Fourth Amendment police litigation.

Again, your Honor, the test under *Graham* is an objective one. Excuse me. It is meant to evaluate the conduct of a police officer not with 20/20 hindsight. There is no Monday morning quarterbacking in police cases, but it is meant to evaluate the conduct of an officer based upon the perspective of a reasonable officer on the scene.

And in *Graham*, the Supreme Court laid out a couple of factors that district courts, the courts of appeal should look at when they are attempting to determine whether the conduct of an officer was objectively reasonable.

Those three factors that you often see cited in the cases are, one, the severity of the crime at issue; two, whether the suspect posed an immediate threat of harm; and three, whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

As we pointed out in our brief, your Honor, if you apply just those three factors -- and really, the *Graham* test is a totality of circumstances test. It's not just those three

factors that the Court is limited to, but those three factors help guide many, many decisions. If you just look at those three factors, I don't think there is any reasonable question, your Honor, I don't think it can really be debated that Timothy Clive's conduct on December 18th, 2022 was objectively reasonable. The crime at issue, the crime that we think Naji committed was the attempted murder of a police officer. Obviously, severe.

Under the second prong, whether the suspect posed an immediate threat of harm, I don't think there is any question about that. He was intent on shooting a police officer, shooting someone that walked into the lobby. Goodness knows what his intent was. But clearly the video evidence depicts that he was an immediate threat, not just a threat, but an immediate threat of harm because he pointed a gun at Officer Clive and pulled the trigger and then was in the act of re-racking that gun because the first bullet that he attempted to fire didn't fire, thank God. And so he was then in the act of re-racking the weapon so that a bullet would go into the chamber and he could then commence firing. And that is why Officer Clive was forced to do what he did, because Ali Naji was, was hellbent on shooting up that lobby that day and he was about to do it, he was within seconds of doing it if Officer Clive hadn't acted. So the first two, *Graham vs. Connor* factors easily, in my judgment, favor Officer Clive.

The third factor, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, as we pointed out in our brief really doesn't come into play here because we just never got to that point. This is not a case where the suspect was attempting to resist arrest or evade flight. If anything, the third factor favors the defendant, but it really is inapposite on these facts because there was no attempt to resist arrest. The encounter simply never got that far.

So under the totality of circumstances test of *Graham*, your Honor, I don't think there is any question that Timothy Clive's conduct was objectively reasonable. And I think it is important to point out that the calculus of reasonableness, when the district court goes about attempting to evaluate this conduct under a totality of circumstances approach, that calculus must take into account the reality that police officers are, are sometimes forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. That's the famous language out of the *Graham* case. And again, I haven't seen a police case where that language is more appropriate than this one. You talk about tense and uncertain and rapidly evolving, this is the nightmare case for any officer when it comes to those factors.

So we think Officer Clive's conduct was clearly objectively reasonable under the Fourth Amendment, under the

*Graham vs. Connor* test, and as a result, the Fourth Amendment claim, the first count of the First Amended Complaint should be dismissed with prejudice.

If, your Honor, if somehow the Court concludes that there was or may have been perhaps a Fourth Amendment violation here, then you get to the second prong of the qualified immunity test; that's the clearly established prong. And I've always thought this, this count or this, this element was a little clunky in the case law. And all it really means is that an officer has to be on notice that what he or she is going to do, what they intend to do potentially violates the Fourth Amendment. If that's the case, then the law is said to be clearly established. And in this situation, there's got to be a Fourth Amendment violation and clearly established law that would put Timothy Clive on notice that what he did or what he was about to do in engaging Mr. Naji would violate the Fourth Amendment.

And so it is incumbent upon the plaintiff in any police case to establish that clearly established prong. They have to give the Court a case or a number of cases that show that the law, given a particular set of facts, is clearly established that what the police officer did has already been passed upon by a court and found to be improper, unreasonable under the Fourth Amendment.

Quite simply, your Honor, there is no case out there,

I mean none, where a police officer is ambushed in this manner and a reviewing court has concluded that he or she is not fully justified in using their weapon to protect themselves.  There is no case out there that shows what, what Timothy Clive did was clearly established to be illegal and against the Fourth Amendment on December 18th, 2022.

Plaintiff cites two cases, a total of two cases on this issue.  One is the *Tennessee vs. Garner* case, and another is *Green vs. Taylor*.  These are the cases that Plaintiff has given the Court to establish that Timothy Clive's conduct was unreasonable on December 18th, 2022.

Your Honor, *Tennessee vs. Garner* is the U.S. Supreme Court case from 1985 that stands for the following proposition:

"Use of deadly force is reasonable where the officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others." That is the rule of *Tennessee vs. Garner*.  That is the rule that is cited in police case after police case, and has been one of the cases that has shaped this doctrine since it was released in 1985.  And yet, that is the case that Plaintiffs are giving the Court to establish the clearly established prong.  It does no such thing.  It holds exactly opposite to the proposition that Plaintiffs need to convince the Court of.

*Green vs. Taylor* is similarly deficient.  It is an unpublished case from the Federal Appendix.  And like *Tennessee*

*vs. Garner*, the assailant in *Green vs. Taylor* was unarmed.  I think that is an important point that the Court has to note, your Honor.  Plaintiffs are giving the Court precedent that they claim establishes the clearly established prong on these facts, and in both of those cases, the assailant was unarmed.  There is no way those cases are apposite to this situation.  It is not even a close question.  And the reason Plaintiffs can't find a case to establish the clearly established prong is that it does not exist.  This case is *sui generis*.  There is no police case like it in any of the cases that I have looked at, your Honor, and I have looked at a lot of them.  These are just the ones I printed out, they are 6 inches thick.

So under the qualified immunity test when it comes to the clearly established wrong, the contours of the Fourth Amendment right, they need to be sufficiently clear, that is, prior to the event.  The contours of the Fourth Amendment right being alleged need to be sufficiently clear so that the officer or the official knows that what he or she is doing either violates the Fourth Amendment or potentially violates the Fourth Amendment.  There is no such contour that was established prior to December 18, 2022.  In all of American jurisprudence, I cannot find a case that is remotely close to the ambush facts of this case.

And so under the qualified immunity test, your Honor, you do not have a violation of the Fourth Amendment because

Timothy Clive's conduct was objectively reasonable. And even if you did have a violation of the Fourth Amendment, there is no case that establishes that what Timothy Clive did on these specific facts was clearly established as of December 18th, 2022.

*Tennessee v. Garner* certainly doesn't carry that burden because it establishes exactly what I'm trying to establish for the Court, that is that where the officer has probable cause to believe that the suspect poses a serious threat of physical harm, he or she may act and use deadly force. That is what I am trying to establish through *Tennessee vs. Garner.* And yet, Plaintiff is telling the Court that it somehow establishes the second prong of the qualified immunity test. Simply impossible. Simply impossible. Both elements of qualified immunity are met in this case, your Honor. And so Count I should be dismissed.

What I'd like to do, your Honor, is very quickly, before we move to the other counts, just touch briefly upon the arguments Plaintiff has made in their response in an effort to mitigate or lessen the impact of the qualified immunity test. I think there are four, four arguments.

The first is the allegation regarding mental illness. We don't know if, if Mr. Naji was mentally ill. That has not been established. Certainly, Officer Clive did not know that Mr. Naji was mentally ill, if he was mentally ill. He didn't

know who this man was when he walked into the police station. He had never seen him before. And importantly, your Honor, even if Timothy Clive knew Mr. Naji and knew that he had some kind of emotional problem, the law is very clear in this area, that police officers facing emergencies are not required to accommodate mental illness. Right? That's the way the law would have to be. Police officers facing emergencies are not required to accommodate mental illnesses.

And we've given the Court three cases on that very issue, the *Gaddis* case, the *Roell* case, and the Puskas case, all from the Sixth Circuit, all cases where the Sixth Circuit found that the use of deadly force against assailants alleged to have been mentally ill were upheld. So the mental illness argument is a red herring. It does nothing to mitigate the qualified immunity test in this case.

Next, Plaintiff -- Plaintiffs make a de-escalation argument. And their de-escalation argument kind of, it seems to me, it kind of goes hand-in-hand with this argument regarding the glass partition that, that Officer Clive was sitting behind when this encounter began.

The argument here, your Honor, is that because Officer Clive was behind a glass partition, allegedly, he had all kinds of time to attempt to implement Dearborn's de-escalation policy and de-escalate this encounter. That is the argument that Plaintiffs have presented to the Court.

I'm not going to spend a lot of time on this argument, your Honor, because simply there is no time to de-escalate on these facts. It was not possible. The argument is disingenuous. It is casuistry at its finest. There was no time to de-escalate, and any other attempt to prove otherwise is simply, is not being truthful in my opinion.

We've given the Court a number of cases, your Honor. I'd like to draw your attention to two of them on this issue. One is the *Puskas* case, which I just mentioned. It was a Sixth Circuit case from 2023. And the other is *Martin vs. City of Broadview Heights* case, a Sixth Circuit case from 2013. I think these two cases perfectly crystalize and juxtapose the law when it comes to this question of de-escalation.

And in no surprise, your Honor, the critical factor when it comes to de-escalation is what's happening; what is the nature of the encounter; what is going on; does the officer really have time to de-escalation. And the line the cases seem to draw is that, generally speaking, when the assailant is unarmed, the officer is encouraged to attempt to de-escalate the encounter. That's where the cases seem to go. That's what the *Martin vs. City of Broadview Heights* case says. It says when an officer is faced with an unarmed individual, that officer should attempt to de-escalate if that is possible.

The *Puskas* case, the Court says the opposite. And *Puskas* was decided just a few months ago by the Sixth Circuit.

It says that plaintiff's argument that the officers should have attempted to de-escalate was simply a non-starter, because the plaintiff was, was waiving a gun around, was acting in a threatening manner and there was simply no time to attempt to de-escalate, and the situation didn't allow for it in the first place.  It was simply too dangerous.

The bottom line here, your Honor, is when it comes to this de-escalation position that Plaintiff is attempting to hash out, Plaintiff has not provided the Court with any case from any jurisdiction, U.S. Supreme Court or otherwise, that, that holds that an officer in a position like the one Timothy Clive found himself in, is required to de-escalate, not even close.  The *Martin* case, I think is the only precedent that the Court cites or that the plaintiff cites on that issue.  And again, in *Martin*, the assailant was unarmed.

The other argument, your Honor, that, that I gleaned out of Plaintiff's brief that kind of loops through is a demurrer or objection about the number of shots that were fired.  This was a situation where Timothy Clive, in the heat of the moment having been ambushed, fired his weapon 17 -- 17 times in about a four to five second single volley.

And, your Honor, you've seen the video.  It speaks for itself.  I would, I would point out here, just like we pointed out in our brief, that in the *Gaddis*, the *Williams*, *Cunningham*, *Boyd*, *Stevens-Rucker* and *Plumoff* cases, those are all cases

involving multiple shots being fired.  In the *Plumoff* case in particular, which is a U.S. Supreme Court case, there were 15 shots fired over in a compressed short period of time.  And the U.S. Supreme Court was very clear that when an officer decides that he or she has to fire in order to neutralize a threat, he or she is entitled to fire until that threat is neutralized.

The point I want to drive home, your Honor, is that in those cases that I mention in my brief, in that long string cite, *Gaddis*, *Williams*, *Cunningham*, *Boyd*, *Stevens-Rucker* and *Plumoff*, those are all situations where officers, in a sense, know what they are walking into.  They know what they are dealing with.  They've been asked to respond to a call, for example, a domestic violence call, for example, or they are involved in a, a chase.  They have an opportunity to assess what is going on before the moment of truth arrives.

Timothy Clive had no such thing.  He was not afforded any opportunity to get his bearings.  All he did was walk up to the front desk and greet Mr. Naji, like he would greet anybody that walks into the police station for service.  He walked up and said, how are you doing.  And Mr. Naji pulled out the gun, pointed it directly at him and pulled the trigger.

And so the emergency that Tim Clive faced on December 18th, 2022 was far more dire than the emergencies that the officers faced in these other multiple shot cases.  And it is clear that in those cases, those are significant exigent

circumstances that all of those officers faced, but none of them approach the dire level of emergency that Tim Clive was presented with when he was ambushed, completely out of the blue, on December 18, 2022.

So the arguments that Plaintiff is attempting to offer the Court to mitigate the impact of qualified immunity, are not successful.

The rest of the case, your Honor, pretty much falls into line with the dismissal of Count I.  Everything follows on behind it and collapses.  The Count II --

THE COURT:  Before you move on, before, before you move on to Count II, would you say -- I know you addressed any kind of obligation to de-escalate.  Did he have any kind of duty to retreat?  And what's the law in that regard?

MR. LEWIS:  There is no duty to retreat, your Honor. I think that the -- you come back to -- it comes back to the *Graham vs. Connor* test.  It comes back to the totality of circumstances in evaluating if what the officer did was appropriate.

The argument that there is a duty to retreat on these facts, I think the point we make in our brief as to that issue is sort of a, a *reductio ad absurdum* argument, that's the way we see it.  We don't think the officer would have a duty to retreat under these circumstances.  And any argument that he did would reduce down to something that was -- that we think is

just something that is indefensible, something totally untenable.

If Tim Clive has an obligation to retreat under these circumstances and not engage the assailant, then, as we said in our brief, your Honor, it is really the end of public safety policing as we know it. I am not aware of any case that requires the officer to retreat under circumstances like this.

As to the remainder of the complaint, Count Two is a *Monell* -- a *Monell* claim, your Honor. *Monell* is the 1978 U.S. Supreme Court opinion. You often see *Monell* claims tacked on to excessive force cases. They are almost always unsuccessful because they are nearly impossible to prove. And the *Monell* case is essentially, is a constitutional claim against the entity, Dearborn itself, for allegedly fostering an unconstitutional policy and practice. And apparently the unconstitutional policy or practice here is condoning the use of excessive force.

What you see in opinions all the time, your Honor, is that the *Monell* claims tend to fall when there is no constitutional violation. That's certainly the law in the Sixth Circuit; that if there is no underlying constitutional violation, there is no basis for the *Monell* claim, and it would be dismissed along with the Fourth Amendment claim.

There are many -- there are many other arguments that municipalities like Dearborn would have in a *Monell* situation.

There is very difficult causation standards the plaintiff would have to meet, and they would have to demonstrate that the policy is unconstitutional to begin with. And yet, Dearborn, like any city, has a vigorous training policy. There's a vigorous policy on excessive force, which is written down and enforced. So there is a tough road to hoe on any *Monell* case, your Honor. But the bottom line is that if there is no underlying constitutional violation, the *Monell* claim collapses immediately.

Count III is an assault and battery case -- I'm sorry, an assault and battery claim. This is a claim under Michigan state law. And when it comes to an intentional tort claim like this one, under Michigan state law, your Honor, you're, you're, you're taken to the *Odom vs. Wayne County* precedent, 482 Mich 459 (2008). That is the case that reshaped intentional tort law within the context of immunity in Michigan, and it is the, the governing standard here.

In order to establish an assault and battery claim under *Odom*, the plaintiff would have to prove that Officer Clive was acting within the course and scope of his authority and that he failed to act in good faith, and that his acts were discretionary as opposed to ministerial.

The good faith element here, your Honor, is, is always the key element when it comes to these, these assault and battery claims. It's subjective in nature under *Odom*. The

good faith element is subjective in nature.  So whereas the, the federal immunity claim is objective in nature, the state immunity claim, at least for intentional torts like assault and battery, is subjective in nature.

So if the, if the federal claim is going to fall on qualified immunities grounds, a fortiori, the state claim, the state assault and battery claim is going to fall, too, because it is an even higher standard being subjective in nature.  That good faith element, your Honor, protects an officer's honest and good faith conduct.  It wraps it in the cloak of immunity, that's what the case says, while exposing to liability officers who act with malicious intent.

There is no evidence here, your Honor, that Officer Clive acted with anything other than an honest belief that Mr. Naji posed a deadly threat.  That is what he testified to.  He testified that he felt that he was in danger of his life; that he was attempting to protect himself and to protect anyone else that may have entered into that lobby.  So it's a very high standard under *Odom* to establish assault and battery.

Count IV is the gross negligence claim, your Honor. This, this count should be dismissed under 12(c) for failure to state a claim.  Michigan law does not allow a plaintiff like the Estate of Naji to plead what is plainly an intentional act, to take that plainly intentional act and call it gross negligence.

Michigan law is -- there are a number of cases that clearly point out that, that an intentional act must be pled as such. And here, Plaintiffs have done that. They've pled assault and battery. And so there is no mechanism in Michigan law to also tack onto that, on these facts, a claim for gross negligence. The Michigan law considers that to be artful pleading. And here, it's obvious, at least it is to me, that Plaintiff has thrown in a gross negligence claim in an effort to avoid the very difficult and harsh precedent of *Odom*, specifically the good faith subjective belief -- the belief test. And so Michigan law simply does not allow a claim for gross negligence on, on these facts, your Honor.

Counts V and VI, your Honor, those are pled in the First Amended Complaint, but we responded to them in our motion, and they were not addressed in the response at all as to either one of those Counts V or VI. And so we think those claims have been abandoned under Rule 56(e)(2). And even if the Court does not agree that they've been abandoned, Count V, the Persons With Disabilities Civil Rights Act claim should be dismissed under 12(c), because this -- it's an anti-discrimination statute similar to the Federal ADA. It prohibits discrimination in employment, housing, public accommodations, public services, and education.

And so when I first read the First Amended Complaint, I thought, well, how is it that that, that this incident is

even captured by that statute.  And of course it isn't, your Honor.  Mr. Naji wasn't looking for public services.  He wasn't denied any public services.  He was allowed into the police station.  He was greeted by Tim Clive, who was just trying to do his job.  And also, there is no way Tim Clive had of knowing Mr. Naji was mentally ill, so there is no way this statute is going to apply to this situation.  And I think it's important to point out, your Honor, that the argument has been abandoned anyway and it should be dismissed under 12c or 56(e)(2).

The same is true of the FOIA count, this has been abandoned.  The FOIA, the FOIA request was made.  It was responded to.  Certain information was withheld under the statute, as we've pointed out in our motion.  And in any event, your Honor, our argument was not addressed in the response.

And so, your Honor, the last thing I would say is that Timothy Clive is a good man.  He's a good police officer.  He has twice been named Officer of the Year in the State of Michigan.  And this good man deserves the protection of the law in this situation.  I would ask for the entire complaint to be dismissed with prejudice.

And I think it is, it is important, your Honor, on these facts, given the way this case has been pled, that the Court strongly consider sanction Plaintiffs for filing not only the complaint, but then the First Amended Complaint in the manner that they did.  There were three, three opportunities to

amend this case, either dismiss the case or amend it after Dearborn showed Plaintiffs the video evidence. All three of those opportunities went by the board.

There is nothing in Plaintiff's First Amended Complaint that, that admits, that even alleges that Mr. Naji was armed. There was nothing in that complaint that, that alleges that he did what he did, that he attempted to fire a shot at Tim Clive. And so that's not what happened, your Honor. It's not even remotely close to what happened. The First Amended Complaint is a work of fiction, and it should be, in our judgment, sanctioned pursuant to 42 USC 1988(b), 28 USC 1927, and/or Rule 11.

Thank you, your Honor.

THE COURT: Thank you, Mr. Lewis.

Mr. Hall, Mr. Markell, [sic] it looks like the information I'm getting on my other screen from the Clerk's Office is more than just a problem with Mr. Hall not having filed an appearance. It looks like, at some point in time, he was suspended from the practice of law in the Eastern District of Michigan; that he petitioned to be reinstated, and that there was an order entered on May 3rd of 2022 that allowed for Mr. Hall to be reinstated so long as Mr. Makled provide a sworn affidavit, and there was some particulars in that regard. And according to the court records, that sworn affidavit has never been received. So Mr. Hall is not eligible to participate in

today's proceedings.

That being said, I would like to move forward.  So I guess, Mr. Lewis, how would you like to move forward?

MR. LEWIS:  Thank you, your Honor.

I think the Court is correct.  I agree that Mr. Hall is not or should not be allowed to participate.  And so if there is going to be oral argument from the Plaintiff's side, it's going to have to come from Mr. Makled.

THE COURT:  Mr. Makled?

MR. MAKLED:  Thank you, your Honor.

One, your Honor, we -- this, this is the first I've ever heard of this, Judge, in terms of Mr. Hall not being able to practice in federal court.  We've been to federal court in a number of other cases where Attorney Hall has practiced.  There was a suspension some time ago for a period of 30 days.  He is now a member of the State Bar of Michigan in good standing, and has no other issues.

I can't speak off the top of my head because I just, I don't know what the Court would like me to do at this point, whether to continue with oral argument.  I'm not prepared for oral argument at this point.

But we've, we've never heard that Attorney Hall is not in a position to appear before the Court.  In fact, we were just before several federal judges in the last 30 to 40 days, and certainly several federal judges in this district over the

course of the last year where, you know, he's been an attorney of record and argued before this, this jurisdiction.  I think the Court is mistaken --

THE COURT:  I don't know what the -- it sounds like he -- maybe there is something that needs to be cleared up.

I'm going to, because in large part, because I want to keep this case moving forward and that Mr. Hall is clearly ready and prepared to argue today, I'm going to allow it this one time.  He will not be allowed to appear in my court again unless this issue is resolved.

So, Mr. Hall, if you would like to present arguments on behalf of the plaintiff at this time.

MR. HALL:  Yes, your Honor.

And it appears that I just received notice that the affidavit was filed in May -- May of 2022 and, and we were reinstated.  So --

THE COURT:  Okay.

MR. HALL:  Okay, so --

THE COURT:  You really need to clean -- clear that up.  Like I said --

MR. MAKLED:  Judge, this affidavit was something -- if the Court wants to proceed we'll proceed.  But this is --

THE COURT:  I want you to proceed.  And I want you to contact Ms. MacKay, my case manager, to make sure this issue is resolved.  Until it's resolved you won't be -- I'll allow you

to argue today, but not again in the future until I have that resolved and my case manager is satisfied.  So if you would like to proceed, please do so.

MR. HALL:  Your Honor, first of all, I would like the Court to consider the, the video in this particular matter and understand why we filed this case at the behest of our clients who had indicated to us clearly that they were concerned, one, about trying to get the information involving the death of their son.  And we ultimately were making an effort to get that information from law enforcement.  And then we were ultimately shown the video months and months later, after we -- after our initial involvement in this matter.  And we wanted the video.

And so when we obtained the video, then we were able to make a determination as to whether or not we should go forward with this case, and we believe that we, we should go forward with the case.  And this is the case that should be determined by the Court.  We urge upon the Court to look at all the facts and circumstances involved in this particular matter, which includes the deposition of Corporal Clive in this particular matter.

So what occurred was, during the course of his deposition, one, he indicates there was no other citizens in the lobby.  There was no other police officers in the lobby. He didn't know when the last time someone was in the lobby, as I recall, and if it was, it would have been early.  And also,

from his vantage point, he couldn't see anyone in the parking lot that would have been confronted by our client.

So our client comes in -- and in addition to that, which is more important, is the fact that he understood that he was behind the bulletproof glass and that he didn't have any reason to believe that any projectile could penetrate the security and sanctity that he was in when he was behind the glass.

So then you have a circumstance where the decedent walks into the station. The decedent ultimately pulls out a weapon and he makes an effort to discharge the weapon, it appears. And so I accept that they could in infer that particular factor. And so then he takes the clip out, which is in the video, and he's making an effort to put the clip back in. Then he touches the top of the firearm. He never racks the projectile, the bullet into the chamber. And then he is shot. And then he is shot 16 more times. Well, when you look at this particular case, when counsel makes reference to the fact that he was ambushed, he was not ambushed.

And also, what the Court could look at, in terms of during the course of the deposition, we had a situation where we presented another video where Officer Clive was involved and another -- and other police officers from the City of Dearborn were involved with. And in that particular situation, two individuals walked into the station, they were armed and they

had long, long weapons.  One of them had a long weapon, and one of them I believe had a short weapon.  But this is the exhibits that's in the course of the deposition.  What the officers did at that point in time was they talked the individuals down.  They de-escalated the situation, and no shots were fired.  The individuals put the weapons on the ground, and that was the end of it.  Those individuals were ultimately arrested.  Not a shot was fired.  So that's what had happened approximately three or four years prior to this particular incident.

So now you have the situation where Officer Clive had been in the rear of the station.  He sees an individual citizen, which was our client, the decedent, walk into the station, and then as indicated, he pulled out the weapon.  So the question in this particular situation is was he ambushed?  Of course he was not ambushed.

Then you look at the, the standard, the severity of the crime at issue.  Our client comes into the -- the decedent comes in with a weapon.  He discharged that.  But then, whether the suspect posed an immediate threat to the safety of the officer and others.  There was absolutely, in our position, no immediate threat to the officer who is behind bulletproof glass.  And there was certainly no other individuals in the lobby, so it was no threat to any other parties.

The third prong of it would have been whether the suspect actively resisted.  Well, that didn't happen because he

was shot and killed, and he was shot 17 times.

So it's interesting to note --

THE COURT: Was he actually shot 17 times? Because I know the glass behind it breaks. How many times was he actually hit?

MR. HALL: Seventeen from the, from the medical examiner's report.

THE COURT: He was hit by every single shot that was fired?

MR. MAKLED: Yes.

MR. HALL: I believe so.

THE COURT: Okay.

MR. HALL: The report suggests.

THE COURT: I don't know. I didn't know because at one point it looks like the glass shatters. I just didn't know. Okay.

MR. HALL: I saw the glass shatter. And I don't know if that was a through and through. It might have been. And I didn't review the autopsy report prior to this particular argument. But we had it at the time of the depositions that I've read of multiple, multiple times. And I know for a fact that he was shot 17 times.

But in addition to that, Mr. Lewis cites to the Court the *Delaware County* case. And in that particular case, if, if the police officers in Dearborn would have acted like the

officers did in the *Delaware County* case, we wouldn't even be here. Because in the *Delaware County* case that counsel cited, it talks about the fact that there is constant discussion with the decedent and the officer. "Let's talk about this. Let's figure out what's going on. Come on, partner, come out here and talk to me." That's what the officer was saying in the *Delaware* case. There's discussion. There's discussion.

In this particular situation, when the officer, if he would have wanted to speak to our client from behind the glass, and he could have talked to him. But he chose, and if you look at the video, he chose to open the glass, so he goes from a position of safety, and not like the Delaware County case, he doesn't engage him at all. He immediately starts discharging the firearm. And so ultimately, the question becomes whether or not we're dealing with a situation where there was excessive force. This is the Fourth Amendment violation that we're talking about that is classic excessive force because it was not necessary.

Now, we understand that if there was an immediate harm, yes, you should discharge the firearm, but that's not the -- that's not the situation. And then that's why we cited to the Court the *Lopez vs. The City of Cleveland*. And that just gives an illustration of what happens. Even in the *Lopez vs. The City of Cleveland*, there is discussion obviously about an effort to try to de-escalate. And then what happens is the

individual decedent, he turns with a machete, and he's about to, the police officer can reasonably believe, assault somebody else.  I guess that was the thought of it.  And then the officer shot him.  The individual had a weapon, he's close proximity to another person, which was the sister, or the wife, and the thought was that maybe he was going to hit her with the machete.  And of course, the court took the position that that, if that's the situation, where summary disposition shouldn't be granted.  And that's why in our brief, we say this is the primary case that we're relying on in this particular matter.  And that was a situation where there was a thought that there could have been an immediate harm that could have been occasioned on another person and officer discharged.

So this case is, is factually specific.  It's based on the facts that are adduced in this particular case.  And that's why we urge upon the Court to look at the two videos, and look at the, the video with respect to what happened prior in 2017, and then look at what happened in this particular case.  And when you see that the officer makes a determination that he's going to open up the glass, start discharging the weapon when there is no imminent threat of injury to him or anyone else, that's excessive.  And that's why we believe that this case should have been brought, and there should be determination on these facts.

And all of the cases since the, the *Connor* case,

there's been hundreds of cases dealing with these issues.  We cited a number of the cases in our brief.  The police can shoot a person that's lying prone, in a position on the ground, yes, you can shoot him, but in that case, the only reason you could shoot was because of the fact that there's a situation where the gun could be pointed at the officer.  It was pointed at the officer.  That's not the case in this situation.

When our client's son is shot, he falls and his body, his head is away from the officer.  There is no claim that the gun is still in his hand.  And there is no claim that he's a threat to the officers or about to do anything to the officers in this particular circumstance.  So that's not what we have before this Court.

So I would urge upon the Court to review the, the video in this particular matter.  Then, look at the non-exhaustive list of factors that you can look at to make a determination as to whether or not this was excessive force.  Either the Court determines that there is a potential for us to go forward on the claim involving excessive force or not, because otherwise, there is no case in this particular matter.  And this is purely an excessive force claim, and that's what we're trying to proceed on.  So I would respectfully urge upon the Court to deny the motion in this matter.

THE COURT:  So the same question to you, Mr. Hall.  Is there any specific law that imposes upon the officer a duty to

retreat?

MR. HALL: No, Judge. But what happens with respect to that is, as Counsel indicated, you have to, to look at the, the reasonableness of the way that the officer is acting in this particular matter.

Generally, when we talk about a duty to retreat in state law, we talk about a situation, one, if it's a claim of defense of self, whether or not the officer or any person would have a reasonable belief that they are going to sustain a serious injury or death. And in this particular case, we contend that there was no reasonable belief that the officer was going to sustain a death in this particular matter or a serious injury. And that the officer chose, in our position, he chose to discharge his weapon, and at the time he did that, and the manner in which he did by opening up a closed door, then discharging that weapon, we believe that he was acting with malice because he had enough opportunity to make a determination as to whether or not he was going to kill this man, and he chose to kill him, and he did kill him.

Now, with respect to assault and battery, when you deal with the assault and battery as indicated, his self-defense claims, you can only have to retreat when you can do so safely. In this situation, he was already in a position of safety at the time he decided that he was going to discharge the weapon. So the question becomes why do you then, if you

discharge a weapon under a situation where you certainly wouldn't be able to avail yourself to a claim of defense of self, because that didn't exist because he couldn't be injured. He knew he couldn't be injured, and he testified that he didn't have any reasonable belief that he felt a projectile could have went through that particular window.

THE COURT:  Is there any case law that supports that argument, that being behind a bulletproof or a shatter-proof or whatever type of glass that is -- I don't know what the -- how effective that is, I really don't know.  But is there any case law that supports the idea that means the officer is in a position of safety?  Is there anything that supports that?

MR. HALL:  Well, yes.  Because all of the case law in this particular area, your Honor, as we indicated, all of the case law indicates, and it's the second prong, whether the officer -- the suspect was an immediate threat to the safety of the officer.  So there's 100 cases on that particular issue. And this particular circumstance, that's why this case is fact-specific.  And when I talk about it being fact-specific, it's because of the fact that the officer is within the relative safety.

THE COURT:  You're saying there's 100 cases where there's an officer standing behind a bulletproof glass?

MR. HALL:  No.  No.  I'm talking about the fact that there is, there is cases that talk about the immediate threat

to the officer.  All the cases talked about an immediate threat.  So in this particular situation, he -- there is no immediate threat, as we contend, because he's behind the glass. So, Judge, if I can't hurt you when I'm behind a glass, what's the immediate threat?

THE COURT:  What about the people -- what about the people that could be in the lobby or other officers?

MR. HALL:  Thank you.  I'm glad you, you asked that, Judge.  And if you look at the video again, you will note, and if you review again the deposition or testimony, the question was interposed of the officer whether or not anyone that was in the lobby, the answer was in the negative; whether or not somebody was coming to the lobby; the answer is in the negative.  And when he looks out and does a panoramic view of the interior of the lobby, no one is there.  And from his vantage point behind the security of that glass, he could see into the immediate parking lot.  No one is there.  And the video even discloses that.  No one is there.

So there is no, no threat to the public at that point, unless you are saying that this is going to take place for an unreasonable period of time.  Well, we also know that the officers, if they were concerned about possibly the -- well, if they wanted to engage in de-escalation and wanted to see whether or not anybody from the public was going to go there, they could have sent other officers out there and they could

have stopped that. That wasn't even a threat. And so that --

THE COURT: Does your argument require with regard to the bulletproof glass that I just assume that the bulletproof glass is impenetrable, and everybody is assuming that? Is there anything that supports that? I mean, my understanding is that's not the case.

MR. HALL: Well, yes, it does support it. Because what happened, your Honor, was the fact that we asked the, the officer, did he have a reasonable belief -- as I recall the testimony, we asked him whether or not he had a reasonable belief that the projectile could penetrate that glass. He said he didn't have any knowledge that it could penetrate that particular glass. He didn't know.

And the situation at this point in time is I don't know, at this point, in terms of when the glass was put in, who put the glass in, because we haven't had the discovery, and what information was disseminated to the fellow officers in the City of Dearborn about the strength of that particular glass. But that's why I had to ask the question during the deposition about whether or not the glass was penetrable.

THE COURT: Mr. Lewis started his arguments by saying that Mr. Naji committed the crime of attempted murder. And I know in your pleadings that you dispute that. Do you agree that he was in the process of committing some kind of a crime? I mean, maybe it's armed with intent to use a dangerous weapon.

I mean, do you think --

MR. HALL:  I'm sorry.  I couldn't hear the --

THE COURT:  Do you agree that Mr. Naji committed any crime?  I mean, I know you dispute whether or not he was engaged in the crime of attempted murder but, you know, what about assault with intent to use a dangerous weapon?

MR. HALL:  Well, that would be a felonious assault.  And in order to make out a felonious assault claim, then you would have to establish that he had the present ability to cause the, the injury.  He didn't have the present ability to injure.

THE COURT:  You're saying, you're saying he didn't engage in any criminal activity whatsoever?

MR. HALL:  He brandished a firearm.

THE COURT:  Okay.

MR. HALL:  And that's a -- I believe that's a misdemeanor.

And, Judge, you know, it's interesting, and I forgot at this point, I wouldn't have obviously be able to anticipate the questions that the Court was going to interpose, but in terms of -- well, I just don't remember what the other individuals in 2017 were charged with after they came into the station with the long guns.

THE COURT:  Okay.  Okay.  All right.  Mr. Lewis, any rebuttal arguments?

MR. LEWIS:  Very quickly, your Honor.  As to the question of the glass, Officer Clive testified that he didn't know if it was bulletproof, bullet resistant or none of those. And there is a distinction apparently between those grades of protection.  He didn't know whether a bullet could come through.  He had no idea.  And that's why, one of the reasons why he did what he did.

But I think the point I want to stress, your Honor, when it comes to the question of retreating and, and bunkering down behind the glass and waiting out Naji, call it whatever you will, is that if Tim Clive didn't engage Ali Naji, nobody was going to engage Ali Naji.  And the danger here, as your Honor alluded, to, was that, you know, there is -- there's other people in this building.  There is -- Tim testified that there is 10, 10 or 12 people typically in the building on a Sunday, as this was, and any one of those people could have unwittingly walked into that lobby at any moment.

There is a staircase that leads right out of the lobby, right up to the second level.  You don't -- you don't have to go through security, you don't have to open a door. You can just run right up those stairs.  And then you're on the second floor, and God knows what happens at that point.  There is an elevator to the right of Officer Clive when all of this is happening.  Someone steps off that elevator.  They are in in enormous danger in a split-second.  Or, if Officer Clive

bunkers down behind that glass and tries to de-escalate, maybe Mr. Naji gets on to that elevator, goes up to the second floor and does God knows what.

So there was only one person who could engage Ali Naji that day, and it was Timothy Clive. That was his sworn duty to do so, and he did it, your Honor. I think the argument that he could have retreated or should have retreated is simply not realistic under these circumstances. It was up to Timothy Clive to stop this man to stop the threat, and he did so.

A couple of other points, your Honor. First, the *Lopez* case. If Plaintiff is telling the Court that the *Lopez* case is its most controlling authority, as it indicates in its response brief, well, that's not much authority. This is a non-binding case from the Federal Appendix. It is not a video case. It is not a shooting case. It is not a gun case. The assailant in the *Lopez* case was wielding a machete. It's a case that where summary judgment was denied to the officer because, according to the judge, the case turned on to credibility of witnesses.

We don't have that problem here. We don't have -- we don't have a clash of witness problem about one witness saying one thing and another witness saying another. We have video evidence that is unassailable and presents to the Court a set of undisputed facts.

And it's important to point out, your Honor, that you

do not have to view the facts in the light most favorable to the plaintiff. That is not the typical Rule 56 situation. *Scott vs. Harris* from the U.S. Supreme Court specifically instructs districts courts in cases like this where there is video evidence that the facts should be viewed in light of what the video shows and nothing else.

And so *Lopez* is not a video case. It, it -- the motion in that case was denied simply because there were witnesses saying different things. We don't have that problem here. So *Lopez* is extremely weak precedent.

As to the 17 shots question, your Honor, the medical examiner's report that, that Mr. Hall is alluding to, I've never even seen. It is not attached to the motion. It was not marked as an exhibit during the deposition. And so I don't know what it says. But I believe that, although 17 shots were fired, I don't believe each of them hit Mr. Naji. The first bullet or two, I strongly suspect, hit the window behind him.

As to this incident that Mr. Hall is referring to, the prior incident involving people in the police department lobby with guns, we alluded to this in our motion, your Honor. That was an incident that occurred in 2017. It was a very strange incident where a couple of men came into the Dearborn Police Department lobby with guns, they had long guns at their sides. They weren't -- they were just sort of hanging off of them. They never raised them up. They never raised them in a

threatening manner.  They were there to make a political point about the Second Amendment.

And so when these two young men walked into the lobby, Officer Clive and some other officers engaged them and told them, quite understandably, get down on the ground.  And they did.  These men were arrested.  They were then charged, I think it was with disturbing the peace, and that was the end of the incident.

The point about that incident, your Honor, is that at no -- at no time did either of these men ever raise the weapon, ever brandish the weapon in a threatening manner.  At no time did they make sudden movements.  At no time were they there to threaten the lives of these officers.  Certainly they never pointed the gun and pulled the trigger.  Had they done that, they would have been shot and killed, I strongly suspect, as Mr. Naji was.  So that incident is -- has nothing to do with this case.

And I would point out that although Mr. Hall played YouTube footage of that incident to Officer Clive during the deposition, the footage was, was never attached to the transcript.  It was never reproduced in any way.  I never got a disk of anything.  It's never been made part of this record in any sense.  And so the notion that the YouTube video from the 2017 incident somehow has some sort of relevance here is, is simply -- is simply wrong.

I would reiterate, your Honor, that under the qualified immunity test, the duty is on the plaintiff.  They have the burden of proving that Timothy Clive is not entitled to qualified immunity on these facts.  And I don't think there is a remotely close question that they've come close to meeting that high burden.

I would ask the Court to dismiss the case in its entirety with prejudice and set a motion hearing for Dearborn to present a motion to the Court with a bill of costs for all of the work that has gone into defending against this ridiculous case.

Thank you, Judge.

THE COURT:  All right.  Thank you, all.  I will issue a written opinion.

And again, Mr. Hall, I would ask that you reach out to Ms. MacKay, and be sure to clean up whatever the issue there may be, re-file the affidavit, whatever it takes, to make sure we don't have that discussion again.

Thank you.

MR. HALL:  That's fine, your Honor.  But, you know, it's very difficult when we put that on the record, the argument, in case somebody else looks at it, because it almost makes it as though you can't fairly listen to what I had to say.  And I certainly wouldn't have appeared if I thought that was a particular issue.  And I --

THE COURT: I --

MR. HALL: -- filed that affidavit, but that's just --

THE COURT: I don't see any reason why I can't fairly hear this case. I simply had questions whether you should, you should present the arguments or whether your partner should present the arguments. It doesn't affect in any way the underlying merits of the case or how I feel about your arguments or the pleadings you filed or the evidence that was presented to me. I don't see any reason why I can't be fair in this case.

Thank you, everybody. Have a good day.

MR. LEWIS: Thank you, Judge.

(Proceedings concluded, 3:14 p.m.)

*       *       *

**CERTIFICATE OF REPORTER**


As a Federal Official Court Reporter for the United States District Court, appointed pursuant to provisions of Title 28, United States Code, Section 753, I do hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date hereinbefore set forth.


Dated this 20th day of December, 2023.


__s/ Christin E. Douglas_____
Christin E. Douglas
RDR, CRR, FCRR, CSR
Federal Official Court Reporter.